530 F.2d 558
 90 L.R.R.M. (BNA) 3265, 78 Lab.Cas. P 11,174
 Seymon B. HARRISON, Appellee,
v.
UNITED TRANSPORTATION UNION, Appellant,
Norfolk and Portsmouth Belt Line Railroad Company, Defendant.
Seymon B. HARRISON, Appellant,
v.
UNITED TRANSPORTATION UNION and Norfolk and Portsmouth Belt
Line Railroad Company, Appellees.
 Nos. 74--1737, 74--1738.
 United States Court of Appeals,
Fourth Circuit.
 Argued Feb. 3, 1975.
Decided Dec. 5, 1975.
Certiorari Denied May 3, 1976.
See 96 S.Ct. 1739.
 
 John M. Ryan, Norfolk, Va. (Vandeventer, Black, Meredith & Martin, Norfolk, Va., on brief), for Seymon Harrison.
 Raymond H. Strople, Portsmouth, Va. (Willard J. Moody and Moody, McMurran & Miller, Portsmouth, Va., on brief), for United Transp. in No. 74--1737; William E. Rachels, Jr., Norfolk, Va. (Wilcox, Savage, Lawrence, Dickson & Spindle, Norfolk, Va., on brief), for United Transp. and Norfolk & Portsmouth R. Co., in No. 74--1738.
 Before HAYNSWORTH, Chief Judge, and WINTER and FIELD, Circuit Judges.
 PER CURIAM:
 
 
 1
 Seymon B. Harrison, a conductor on the Norfolk and Portsmouth Belt Line Railroad (Belt Line), sued the railroad and United Tansportation Union (UTU) and Local 854 of UTU. He dismissed the suit against Local 854 before trial. The complaint alleged that Belt Line and UTU had illegally conspired in the handling of Harrison's grievance that he was improperly suspended for sixty days for purported insubordination and failure to obey an order of his superior. In a jury trial, the district court directed a verdict for Belt Line on the ground that the evidence was legally insufficient to prove that it entered into a civil conspiracy with UTU. The district court submitted the case against UTU to the jury, which awarded a verdict against UTU for $1,570 in consequential damages as compensation for lost wages and $6,000 in punitive damages.
 
 
 2
 Harrison and UTU have both appealed. Harrison contends that the district court erred in directing a verdict for Belt Line and in refusing to award him attorneys' fees. UTU argues that the evidence was insufficient to show that it breached its duty to represent Harrison, that it cannot be liable for compensatory damages equivalent to Harrison's loss of wages, and that no punitive damages should have been assessed against it.
 
 
 3
 We think Harrison is correct in his contention that the district court should have awarded him attorneys' fees. However, in all other respects we affirm the district court's judgment.
 
 
 4
 --I--
 
 
 5
 On the evening of August 18, 1970, Harrison became embroiled in a verbal altercation with a certain Lassiter, an assistant Trainmaster and road foreman of engineers. The discussion was both vehement and blunt. Lassiter wanted to know why Harrison did not call the Yardmaster for orders before the train on which Harrison was a conductor reached the West End Junction in Norfolk, Virginia. Lassiter also told Harrison that a certain brakeman should be lining up switches. Harrison defended his conduct on the first point and asserted that the matter of directing the brakeman's activity was within the discretion of the conductor, to-wit, himself. During the discussion, Lassiter told Harrison several times to be in Lassiter's office at 8:30 a.m. the next morning. Harrison testified, however, that after conferring with Yardmaster Bowen before the appointed hour, and learning that Bowen would talk to Superintendent Huddle about what had occurred, Harrison did not believe that he was required to go to Lassiter's office at 8:30 a.m. and did not do so. When he attempted to report for work at 4:00 p.m. on August 19, a railroad official told him that he was being held out of service. Harrison immediately communicated with the Chairman of Local 854, who agreed to represent Harrison. Harrison was charged with violation of Rule 427, 'insubordination', and Rule 554, 'failure to obey the orders of a superior.'
 
 
 6
 The hearing on the charge against Harrison was postponed once so that his case could be properly prepared, but the matter was eventually heard and Harrison was advised in writing that he was suspended without pay for sixty days beginning August 19, 1970, for violating Rules 427 and 554. Harrison's representative filed a claim objecting to the suspension and requesting that Harrison be reinstated and paid for all time lost. This claim was denied and an appeal was taken to the General Committee of Adjustment.
 
 
 7
 On or about December 21, 1970, a meeting occurred between the UTU General Chairman of the General Committee of Adjustment and F. W. Morrison, President of Belt Line, at which Harrison's claim was discussed. Although the union representative argued that Lassiter's conduct mitigated Harrison's failure to obey the order to be in Lassiter's office, President Morrison concluded to uphold the previous decisions.
 
 
 8
 According to the terms of the bargaining agreement between Belt Line and the UTU, Harrison or his representative had sixty days in which to file an appeal from the president's decision. On February 11, 1971, a written notice of appeal was given by the union representative (he had recently qualified as General Chairman); and on April 20, 1971, a meeting occurred between the union representative, the chairman of the Local Committee of Adjustment, the superintendent and the Belt Line president. At the meeting, the grievances of Harrison, a certain Howard J. Gray, Jr., and others were discussed. Gray, who had been discharged by the railroad, had a record of numerous violations of the railroad's rules and an arrest and fine for public drunkenness.
 
 
 9
 Precisely all that was discussed at the meeting is a matter of considerable dispute, but Morrison made a memorandum for his file in which he stated, 'Conductor Howard J. Gray, Jr., will be reinstated * * * provided the UTU does not further progress * * * the claim in favor of S. B. Harrison. It was agreed by those in attendance that they would not be progressed until too late to do so account time limit.' (Emphasis added.) In violation of the union's constitution and by-laws, Harrison was not advised of the agreement not to 'progress' his claim. The reasons for the failure to notify Harrison that his claim would not be 'progressed' (appealed to a Public Law Board or the First Division of the National Railroad Adjustment Board) are in dispute. Harrison claims that the failure to notify him was intentional. The UTU claims that it was an accidental oversight. In any event, Harrison's right to pursue his claim, individually or through a union representative, lapsed, and thereafter he filed this suit.
 
 
 10
 --II--
 
 
 11
 We reject Harrison's claim that the district court should have submitted to the jury the question of his right to recover against Belt Line. While Harrison's complaint alleged that his suspension was improper, he did not seek recovery against the railroad on that basis. Rather, he sought relief against Belt Line solely upon the ground that it had participated in a civil conspiracy to deprive him of his right to pursue his grievance. From our reading of the record, we do not find sufficient evidence to put to the jury the question whether Belt Line was a coconspirator in a civil conspiracy. As we stated in Ross v. Peck Iron & Metal Co., 264 F.2d 262, 268 (4 Cir. 1959), a civil conspiracy is a combination of two or more persons to accomplish an unlawful purpose, or to accomplish a lawful purpose by unlawful means.
 
 
 12
 The memorandum of the April 20 meeting may be construed to establish that various grievances of various individuals were 'traded', but such a construction does not prove that the railroad breached a duty toward Harrison. Belt Line is under no legal duty to represent its employees; it is free to represent its own interests where they conflict with those of an employee. Nor, as a general rule, is Belt Line required to make certain that the union fairly represents Belt Line's employees. The case might be a different one if Harrison had proved that Belt Line and UTU acted in concert with the joint motive to discriminate against the employee, as was alleged in Glover v. St. Louis-San Francisco Railway Co., 393 U.S. 324, 89 S.Ct. 548, 21 L.Ed.2d 519 (1969). It might be different also if Belt Line could be charged with knowledge that the UTU was under a duty to give Harrison timely notice that it would no longer represent him and that he must proceed alone, and that in spite of such knowledge the railroad agreed with UTU to breach that duty.[1] In oral argument, however, Harrison's attorneys conceded that the railroad had no knowledge of the union's duty to notify Harrison that it would not 'progress' his rights. Without such proof, we cannot conclude that Belt Line conspired to accomplish the lawful objective of sustaining discipline against Harrison by the unlawful means of denying him fair representation of his grievance claims.
 
 
 13
 UTU, however, could be found to have breached its duty to Harrison. A union must serve the interests of all members without hostility, discrimination, arbitrariness or capriciousness toward any. Although a union may exercise discretion in representing employees, it must act with complete good faith and honesty. This is settled law. Vaca v. Sipes, 386 U.S. 171, 177, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); Griffin v. International Union, UAW,469 F.2d 181, 182--83 (4 Cir. 1972). See also Czosek v. O'Mara, 397 U.S. 25, 90 S.Ct. 770, 25 L.Ed.2d 21 (1970); Woods v. North American Rockwell Corp., 480 F.2d 644 (10 Cir. 1973); Lewis v. Magna American Corp., 472 F.2d 560 (6 Cir. 1972); Turner v. Air Transport Dispatchers' Association,468 F.2d 297 (5 Cir. 1972); Encina v. Tony Lama Boot Co., 448 F.2d 1264 (5 Cir. 1971).
 
 
 14
 In the instant case, we think that the evidence indicates that Harrison's grievance may have had merit. This does not establish that the union's failure to press the grievance was a failure to represent him fairly, but proof of a grievance's merit is circumstantial evidence that the failure to process the claim constituted bad faith. Moreover, the jury could well have concluded from the memorandum of the Belt Line president, Morrison, and the other evidence that Harrison's grievance was arbitrarily relinquished when UTU gave it up to further the grievance of conductor Gray. Finally, the jury could well have found from the conflicting evidence that UTU, in violation of its constitution and bylaws, consciously and intentionally declined to give Harrison timely notice that it would represent him no further and that he must proceed alone. Even if UTU's decision not to further Harrison's claim was reached in good faith, UTU was bound by its constitution and bylaws to notify Harrison so that he could pursue any appeal on his own. Therefore, a conscious decision not to notify Harrison would constitute an arbitrary action in breach of UTU's duty of fair representation. See Cato v. South Atlantic & Gulf Coast District of I.L.A., 364 F.Supp. 489, 492 (S.D.Tex.1973), aff'd,485 F.2d 583 (5 Cir. 1973). In short, we find a dual basis on which UTU could properly have been found to have breached its duty to represent Harrison rather than to have exercised in good faith its broad discretion not to assert his rights. See generally Clark, 'The Duty of Fair Representation: A Theoretical Structure', 51 Tex.L.Rev. 1119, 1174--77 (1973).
 
 
 15
 --III--
 
 
 16
 Upon the facts of this case, we think that the union may be held responsible for compensatory damages and that Harrison is entitled to recover from UTU for his loss of earnings during his suspension from Belt Line.
 
 
 17
 In 1972 the Supreme Court, reversing earlier decisions, clearly held that a claim of discharge in violation of a union contract must be processed before the Railroad Adjustment Board. Andrews v. Louisville & Nashville Railroad Company, 406 U.S. 320, 92 S.Ct. 1562, 32 L.Ed.2d 95 (1972). While the Court stated that, very broadly construed, the exhaustion of administrative remedies doctrine might be said to cover what it was doing, the clear implication of the holding and of that part of the opinion is that the Railway Labor Act was construed as providing an exclusive remedy. 406 U.S. at 325, 92 S.Ct. 1562. We construed Andrews as holding as much in Dorsey v. Chesapeake & Ohio Railway Company, 476 F.2d 243 (4 Cir. 1973). Viewed in the light of Andrews, the failure of the union to present the grievance to the Railroad Adjustment Board within the time allowed extinguished Harrison's right to pursue his claim. Under these circumstances, the union should be responsible to Harrison for the value of the right he lost as a direct result of the union's deliberate misconduct.
 
 
 18
 We do not think that Czosek v. O'Mara, 397 U.S. 25, 90 S.Ct. 770, 25 L.Ed.2d 21 (1970), undermines this conclusion from Andrews. In Czosek the plaintiffs, former employees of the Delaware Lackawanna Railroad, claimed that they had been replaced by former employees of the Erie Railroad in violation of the merger agreement. The union allegedly was hostile to the claim throughout with no indication that the plaintiffs were misled into reliance upon union representations that it would protect the plaintiffs' rights. In its opinion, the Court of Appeals for the Second Circuit held that the plaintiffs had lost their contractual claim for lost wages against the railroad because they, without union aid, could have presented their claims to the Railroad Adjustment Board, and, not having done so, the right to enforce such claims against the railroad was lost. O'Mara v. Erie Lackawanna Railroad Co., 407 F.2d 674 (2d Cir. 1969). The broad statement in the opinion of the Supreme Court that the union should not be required to pay the wage claims but only a sum measured by the additional cost and trouble to which the plaintiffs would have been put in enforcing such claims must be read against that background. There, the plaintiffs had a fair opportunity to procure their own counsel and had they done so, the Supreme Court's statement would indicate the union should be required to reimburse them for the legal fees and other expense to which the individual plaintiffs had been put. The total economic loss should not have been visited upon the union, for the loss of the right to enforce the contract claim was as much the fault of the individuals as the union's, and the individuals should suffer the consequence of their own inaction when the union had never undertaken to process the grievance. In contrast, Harrison never had a fair opportunity to process the grievance himself or to obtain counsel to represent him. The union had undertaken the handling of the grievance and the right of enforcement was lost because of the union's decision not to process the grievance but to withhold information about its decision from Harrison until the right of access to the Adjustment Board was lost. Here, in contrast to Czosek, the union's conduct has not simply put Harrison to additional trouble and expense; it has extinguished his right of enforcement. The union should respond to the extent of the value of that right, and since there is evidence to support the jury's finding that the value of the right was the economic loss suffered by Harrison as a result of the suspension, it should not be disturbed.
 
 
 19
 Finally, such cases as Schum v. South Buffalo Railway Company, 496 F.2d 328 (2 Cir. 1974), deserve mention. In Schum, decided after Andrews, it was held that the employee's right of action against the railroad was not extinguished because of failure to resort to the procedures of the Adjustment Board when the failure was attributable to the union rather than to the individual employee. Schum, however, appears to us to be inconsistent with the whole theory and purpose of the Act as construed in Andrews. Grievances founded upon contract claims must be presented to the Adjustment Board, and the only right of action in the district courts is for the enforcement of its awards. In fairness, the consequence of the loss of the right of action should not be visited upon the employee, if the loss was not the result of his own conduct. But if the loss results from the deliverately misleading conduct of the union, the union may be held to respond in compensatory damages to him, and there is no reason to stretch the statute to permit the employee's maintenance of an original cause of action against the railroad.
 
 
 20
 --IV--
 
 
 21
 We must also reject the contention of UTU that the award of punitive damages should be stricken.
 
 
 22
 All jurisdictions agree that the purposes of punitive damages are to vindicate the plaintiff, punish the wrongdoer and set an example that the tortious conduct should not be repeated. See Northwestern National Casualty Co. v. McNulty, 307 F.2d 432, 435--36 (5 Cir. 1962); Adams v. Hunter, 343 F.Supp. 1284 (D.S.C.1972), aff'd, 471 F.2d 648 (4 Cir. 1973). While compensatory damages may to some degree serve the same purposes, it is not unusual in a fair representation suit against a union to find the liability for compensatory damages to be de minimis. St. Clair v. Local No. 515, 422 F.2d 128, 132 (6 Cir. 1969). Unless punitive damages are available, an employee may lack the strong legal remedy necessary to protect his right against a union which has either maliciously or in utter disregard of his rights denied him fair representation. The situation is analogous to that present in civil rights actions where the plaintiff's rights are equally important and often equally difficult to enforce without the threat to defendants of liability for punitive damages in an aggravated case. Courts have held in civil rights suits that the 'federal common law of damages' is controlling and permits the recovery of exemplary or punitive damages, even in those cases where compensatory damages may be merely nominal. Basista v. Weir, 340 F.2d 74, 87 (3 Cir. 1965).
 
 
 23
 UTU contends also that actual malice is necessary for an award of punitive damages. This is the rule in Maryland, for instance, when the alleged tort arises out of contractual relationship. See H & R Block, Inc. v. Testerman, 275 Md. 36, 338 A.2d 48 (decided May 26, 1975). Actual malice is usually shown by proof of personal animosity between the parties. The Ninth Circuit has held, however, that in a civil rights suit personal animosity is not 'a prerequisite to instructing the jury as to punitive damages or to the granting of such damages.' Gill v. Manuel, 488 F.2d 799, 801 (9 Cir. 1973). Again analogizing the union's duty of fair representation to a constitutional duty, we hold that in the instant case proof of personal animosity or actual malice was not necessary. In telling the jury that it might award punitive damages if it found that UTU acted wantonly or maliciously or that it acted recklessly or in callous disregard of Harrison's rights, or that Harrison's rights were disregarded with unnecessary harshness or severity, the trial court gave unexceptionable instructions. Therefore, recovery of punitive damages is sustained.
 
 
 24
 --V--
 
 
 25
 We think that the district court should have awarded reasonable attorney's fees to Harrison. In Hall v. Cole, 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973), the Supreme Court affirmed an award of attorney's fees to a union member who successfully sued his union for violation of his free speech rights guaranteed by § 101(a)(2) of the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 411(a)(2). The Court said that 'by vindicating his own right of free speech * * * (the plaintiff) necessarily rendered a substantial service to his union as an institution and to all of its members.' 412 U.S. at 8, 93 S.Ct. at 1948. Therefore, it was appropriate for all of the members, through the union, to pay the attorney's fees of the plaintiff.
 
 
 26
 Harrison's suit also vindicates a right shared by all members of his union: the right to fair representation of each individual's claims against the employer. See generally Clark, 'The Duty of Fair Representation: A Theoretical Structure', 51 Tex.L.Rev. 1119, 1174--77 (1973). We think that application of Hall therefore compels an award of attorney's fees to Harrison.[2] The amount, of course, is within the discretion of the district court.
 
 
 27
 --VI--
 
 
 28
 Aside from the issue of attorney's fees, the judgment of the district court is affirmed. The case will be remanded for the allowance of reasonable attorney's fees for the representation of Harrison in the district court and here.
 
 
 29
 Modified and affirmed and remanded.
 
 
 30
 WINTER, Circuit Judge (concurring in part and dissenting in part):
 
 
 31
 I agree with the majority that the district court correctly directed a verdict for Belt Line, that Harrison's recovery of $6,000 in punitive damages should be sustained, and that the district court should be directed to allow Harrison counsel fees. Accordingly, I concur in Parts I, II, IV and V of the majority opinion. In the light of Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), and Czosek v. O'Mara, 397 U.S. 25, 90 S.Ct. 770, 25 L.Ed.2d 21 (1970), I am unable to conclude that Harrison's recovery for lost earnings can be sustained and I therefore respectfully dissent from Part III.
 
 
 32
 Vaca was a suit by a union member against the union alleging, inter alia, that he had been improperly discharged by his employer and that the union had arbitrarily refused to take his grievance to arbitration. While the Court held that, on the facts, arbitrary or bad faith conduct on the part of the union in processing the grievance had not been shown, the Court also held that '(t)he appropriate remedy for a breach of a union's duty of fair representation must vary with the circumstances of the particular breach.' 386 U.S. at 195, 87 S.Ct. at 919. Both a decree compelling arbitration and damages were mentioned as possible remedies. But the Court held that the union could not properly be held liable for those damages which are attributable solely to the employee's allegedly wrongful discharge:
 
 
 33
 (M)ay an award against a union include, as it did here, damages attributable solely to the employer's breach of contract? We think not. Though the union has violated a statutory duty in failing to press the grievance, it is the employer's unrelated breach of contract which triggered the controversy and which caused this portion of the employee's damages. The employee should have no difficulty recovering these damages from the employer . . .. With the employee assured of direct recovery from the employer, we see no merit in requiring the union to pay the employer's share of the damages. (Footnote eliminated.) 386 U.S. at 197, 85 S.Ct. at 920.
 
 
 34
 Of course, in Vaca the employer was not a railroad and was subject to the provisions of the National Labor Relations Act and the Labor Management Relations Act. Harrison contends that the employee was not permitted to recover loss of earnings from the union in Vaca because the employee had a remedy against the employer under these Acts. In the instant case, the argument runs, the employer is a railroad and the provisions of the Railway Labor Act do not give a railroad employee a similar right of action for loss of wages against his employer; therefore, Vaca does not bar his recovery of lost wages from the union.
 
 
 35
 Czosek, however, answers Harrison's argument. It was a case in which employees of a railroad sought damages against the railroad and the union. The employees alleged that they had been wrongfully discharged by the railroad and that the union had been 'guilty of gross nonfeasance and hostile discrimination' in refusing to press their claims. The district court dismissed the railroad for failure to exhaust administrative remedies and lack of diversity jurisdiction. In this respect, the Court of Appeals affirmed, but ordered that on remand plaintiffs be given the right to amend their complaint if they wished to allege 'that the employer was somehow implicated in the union's discrimination.' The district court also dismissed the claim against the union, but the Court of Appeals reversed.
 
 
 36
 In the Supreme Court, the union challenged dismissal of the complaint against the railroad; evidently it feared that it might be held liable for damages inflicted by the employer. But the Court held that even if the railroad were not joined, judgment against the union could be had only for those damages that flowed from its conduct:
 
 
 37
 Assuming a wrongful discharge by the employer independent of any discriminatory conduct by the union and a subsequent discriminatory refusal by the union to process grievances based on the discharge, damages against the union for loss of employment are unrecoverable except to the extent that its refusal to handle the grievances added to the difficulty and expense of collecting from the employer. 397 U.S. at 29, 90 S.Ct. at 773.
 
 
 38
 The majority asserts that, strictly viewed on its facts, the holding and language of Czosek do not answer Harrison's contention. I cannot agree. The flat language of the Czosek opinion can be searched in vain for any suggestion that it was predicated on recognition that the employees had an independent right to recover lost wages from the railroad. By its interpretation of Andrews v. Louisville & Nashville Railroad Company, 406 U.S. 320, 92 S.Ct. 1562, 32 L.Ed.2d 95 (1972), the majority impliedly holds that Andrews overruled Czosek sub silentio. I see no warrant for this view. Andrews, too, can be searched in vain for any language indicating that Andrews was intended to have that effect. Moreover, the majority's conclusion also flies in the teeth of the rationale of Vaca that, in an alleged wrongful discharge case, it is the employer's breach of the contract of employment which gives rise to the loss of wages, not the union's failure properly to press the claim.
 
 
 39
 My view that Harrison ought not to recover loss of earnings might seem harsh if employees in Harrison's situation could not win compensation from employers on meritorious breach of contract claims. The question is not directly before us, since Harrison has neither expressly alleged nor pressed a claim of wrongful suspension against Belt Line. But if Harrison's failure to press such a claim is not a sufficient reason to justify the majority's departure from the exact language of Vaca and Czosek, I add that I am persuaded that in a proper case the means for making such a claim do exist. If an employee covered by the Railway Labor Act has an independent contract claim against his employer, the appropriate initial forum is generally the Adjustment Board. Andrews v. Louisville & Nashville R.R. Co., supra.[1] Where this forum is closed to the employee because of his union's breach of the duty of fair representation, the employee is not precluded from suing the employer. See Schum v. South Buffalo Rwy. Co., 496 F.2d 328 (2 Cir. 1974).[2] 'To leave the employee remediless in such circumstances would . . . be a great injustice.' Vaca v. Sipes, supra, 386 U.S. at 185--86, 87 S.Ct. at 914. Federal jurisdiction for the fair representation claim against the union exists under 28 U.S.C. § 1337. Tunstall v. Brotherhood of Locomotive Firemen, 323 U.S. 210, 213, 65 S.Ct. 235, 89 L.Ed. 187 (1944). The employee's independent claim against the employer may be treated as pendent to the claim against the union.[3] Other grounds of jurisdiction for the claim against the employer may also exist.
 
 
 40
 In any event, to my mind Czosek dictates that Harrison cannot recover loss of earnings for his suspension from the railroad. He did not allege that the union 'affirmatively caused the employer to commit the alleged breach of contract.' Vaca, 386 U.S. at 197 n. 18, 87 S.Ct. at 920. Nor does the record contain any evidence that UTU played any part in Belt Line's decision to suspend Harrison. And since he has not sought to recover damages from Belt Line for wrongful discharge, he can hardly claim that the union increased the difficulty and expense of recovery of such damages.
 
 
 41
 I conclude that the only compensatory damages that Harrison may recover from UTU are those caused directly by the union's failure to afford him good faith representation. But Harrison has not proved any special damages resulting from the union's breach of duty. At most, his consequential damages are only nominal. If only nominal, I would not grant him or UTU a new trial; I would simply direct that this portion of the judgment be reduced to $1.00.
 
 
 42
 While I agree with the majority in sustaining Harrison's recovery of punitive damages, in view of the fact that I would reverse, or drastically reduce, his recovery of compensatory damages, I should add a word about why I would reject UTU's argument, in reliance of the law of Virginia, that punitive damages may not be awarded when there is no recovery of compensatory damages. The short answer is that while state law may sometimes provide useful guides in adjudicating federal rights, Thompson v. Brotherhood of Sleeping Car Porters, 316 F.2d 191, 199--200 (4 Cir. 1963), a case like the instant one should be decided by the 'federal law which the courts must fashion from the policy of our national labor laws.' Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 456, 77 S.Ct. 912, 918, 1 L.Ed.2d 972 (1957). Accordingly, I think that the majority is fully justified in fashioning a federal common law of damages to sustain Harrison's recovery of punitive damages.
 
 
 
 [1]
 See, e.g., Ferro v. Railway Express Agency, Inc., 296 F.2d 847, 851 (2 Cir. 1961)
 
 
 [2]
 Just as the common-benefit theory applies in the instant case, so it is not relevant when the imposition of attorney's fees on the defendant will not have the effect of making the beneficiaries of the suit pay for some of the litigation costs. See, e.g., the Court of Appeals' rejection of the common-benefit theory in Wilderness Society v. Morton, 161 U.S.App.D.C. 446, 495 F.2d 1026, 1029 (1974), reversed as to application of the 'private attorney general' doctrine, Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975)
 
 
 [1]
 But see Conrad v. Delta Air Lines, Inc., 494 F.2d 914, 918 (7 Cir. 1974), which held Andrews applies only where the dispute stems 'from differing interpretations of the collective-bargaining agreement,' Andrews v. Louisville & Nashville R.R. Co., 406 U.S. at 324, 92 S.Ct. at 1565, and not where the employee's claim 'rests upon a charge' that the employer violated the Railway Labor Act itself
 
 
 [2]
 It is also possible that 'when a single series of events gives rise to claims against the employer for breach of contract and against the union for breach of the duty of fair representation,' the employee may not be required to take his claim against the employer to the Adjustment Board, even if the Board is open to him. The Supreme Court specifically reserved this question in Czosek v. O'Mara, 397 U.S. 25, 30, 90 S.Ct. 770, 774, 25 L.Ed.2d 21 (1970). Andrews does not necessarily provide the answer. I think that Schum was correctly decided
 
 
 [3]
 See Leather's Best, Inc. v. S.S. Mormaclynx, 451 F.2d 800 (2 Cir. 1971); Stone v. Stone, 405 F.2d 94 (4 Cir. 1968), holding that if there is federal jurisdiction against one party, pendent jurisdiction may bring in a closely related state claim against another party. But see the restrained discussion of this point in Moor v. County of Alameda, 411 U.S. 693, 713--15, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973). See generally UMW v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); 13 Wright, Miller & Cooper, Federal Practice and Procedure & 3567 at 439--62