Wallace T. SMITH et al.

v.

The B & O RAILROAD COMPANY et al.

Civ. No. Y–78–26.

United States District Court, D. of Maryland.

June 25, 1979.

L. Robert Evans and Peter Max Zimmerman, Towson, Md., for plaintiffs.

H. Russell Smouse and Joseph B. Geyer, Baltimore, Md., for defendants B & O R. Co. and Western Maryland Ry. Co.

Norris W. Tingle, Baltimore, Md., and Norton N. Newborn, Cleveland, Ohio, for defendant United Transp. Union.

JOSEPH H. YOUNG, District Judge.

Wallace T. Smith and others seek declaratory, injunctive and punitive and compensatory monetary relief against the defendants, The Baltimore & Ohio Railroad Company (hereinafter "B & O"), The Western Maryland Railway Company (hereinafter "Western Maryland"), and United Transportation Union (hereinafter "United"). The defendants have moved for summary judgment, the plaintiffs have moved for certification of a class and for an order compelling discovery.

## I. THE FACTS

Plaintiff Smith, an employee of B & O is chairman of Local 600 of United's East End Cumberland Division. Plaintiffs Miller, Kasecamp, Bruno and Long are also B & O employees and United members. The defendants are two railroad companies—both subsidiaries of the Chessie System—and the union which represents their employees.

Prior to 1975, the B & O and Western Maryland railroad systems were managerially as well as geographically distinct. On June 20, 1975, however, the Chessie System gave notice of its intention to merge the yard operations of the two into a single unit at Cumberland, Maryland. This consolidation required an integration of work forces which had been operating at Western Maryland's Knob Mount and Ridgely yards with the existing B & O crew at Cumberland. From July to December, 1975, negotiations dealing with the impact of the consolidation upon the workers at each yard were held between the union and the two railroads. Attending these negotiations were various persons representing Chessie, B & O, Western Maryland and United, including Plaintiff Smith.

Following an examination of test statistics from May, 1974 to April, 1975, the parties agreed to a work equity ratio of approximately eighty-twenty between B & O and Western Maryland—i. e., B & O employees would do 80% of the work in the consolidated yard, and Western Maryland would do 20%. To allocate the work according to this agreed division, a joint service list or "numbers system" was adopted.[1]

---

**1.** Under the so-called "numbers system" a joint service list (also termed an order of selection list) is prepared which is utilized as a means of allocating jobs in the consolidated yard. Each worker retains his seniority as established by the seniority roster applicable to his group, as well as his seniority rights vis-a-vis all other members of his group; the separate units are combined according to the equity of work between the work forces. A number then is assigned to each man in keeping with his position on the joint service list and job preferences are honored according to a man's standing on the list, as determined by his number. In the instance of the consolidation of the B & O and Western Maryland yard crews at Cumberland, the equity of work was computed to be approximately 80% and 20%, respectively, so that the

Considerable uncertainty surrounds Smith's position on the "numbers system." In an affidavit, Smith has stated that he "definitely opposed the implementation of the numbers system. . . ." *See* Exhibit I of Plaintiff's Answer to Motions for Summary Judgment, at 6. Plaintiff Bruno has also referred to a union meeting at which Smith voiced his opposition to the system. *See* Exhibit 2 of Plaintiff's Answer, at 1–2. Moreover, deponents Van H. Parsons, Paul R. Bennett and George P. Stanton—all present or former officials of one of the defendants—have stated that Smith did not oppose this manner of allocation. *See* Depositions of Stanton, at 79; Parsons, at 53, and Bennett, at 14.

The various statements presently in the record also leave unclear the alleged agreement of the railroads to shift all of the work which had been done at the Western Maryland yards to the B & O yard. Smith has stated that he was never informed that the railroads had planned to move some of the former Western Maryland workers to Connellsville, Pa. and to a yard in West Virginia. In their depositions, however, Charles Schuler and Walter Nelson, both officers of Chessie, state that it had divulged all of its plans for relocation of rail operations at the outset of the negotiations.

On December 4, 1975, the consolidation agreement was executed in Baltimore, Maryland. The identity of all who attended the signing is also unclear. Stanton has stated that he is uncertain who was present, but he believes none of the local union members attended. *See* Stanton's deposition at 108–09. Plaintiff Smith has said that he was not present. *See* affidavit, at 7. Shortly after the execution of the agreement, dissension and unrest apparently increased among the B & O workers, and on December 21, 1975, a general meeting was held to allow them to air their grievances. It was at this meeting that Smith attacked the use of the "numbers system," and called for a revision of the consolidation agreement. *See* Bruno's affidavit, at 1–2; Deposition of Stanton, at 112.

On December 29, 1975, Smith in a letter to the General Secretary and Treasurer of United's Board of Appeals, challenged the consolidation agreement on behalf of Local 600. On January 7, 1976, he was informed that his letter would not be accepted as an appeal, because it did not contain supporting evidence as prescribed by United's Constitution. A second letter from Smith, dated March 10, 1976, was also rejected because it was filed more than ninety days after the challenged agreement.

In the Spring of 1976, a referendum was held to test the attitude of the membership of United's B & O and Western Maryland locals as to the "numbers system." The B & O locals voted to abolish the "numbers system" in favor of a "straight seniority" system of job allocation. The Western Maryland locals, however, voted to retain the "numbers system." The leadership of the Union was unable to agree on steps to be taken to placate the dissatisfied B & O employees. *See* Deposition of Al H. Chesser (President of the U.T.U.), at 21–22.

The economic effect of the consolidation agreement on the B & O union members has been variously described. Mario Delsignore, one of Western Maryland's trainmasters, stated that only three B & O workers were furloughed as a result of the consolidation—all of whom were later recalled. *See* Deposition at 109–112. The plaintiffs, however, have alleged that as many as 35 B & O employees were "displaced" as a result of the agreement because the Western Maryland men who came to the Cumberland yard "did not bring their work with them." Plaintiff Smith has graphically described the injury which the B & O employees have allegedly suffered:

I became aware very quickly that the amount of work in the combined yard

---

B & O men received four positions on the joint service list for every one position awarded to a Western Maryland man. During the negotiations, it was decided that the B & O men would receive the first two positions on the joint service list, and the Western Maryland men would receive the third position and each fifth position thereafter. *See* Deposition of Wallace T. Smith, February 21, 1979, at 21–23.

after the consolidation in or about January, 1976 was about the same as the amount of work before the consolidation. The difference was now that approximately thirty-five (35) Western Maryland employees came into the yard, to share in approximately the same amount of work. If there was any addition to the amount of work, it was extremely insignificant. The result of this was that the B & O men lost their assignments to the Western Maryland men. In other words, the thirty-five (35) or so Western Maryland employees came into the combined yard and displaced the B & O employees. These employees had to apply for road jobs or jobs at other locations where they had seniority rights, all less preferred jobs, with varying times, hours, and wages. Moreover, a similar number of B & O employees, those with least seniority, were furloughed, at least for a period of time until recalled due to attrition or other events. My examination of records kept in the ordinary course of business of Local 600 indicates that twenty (20) B & O employees of the East End Division were furloughed in early January, 1976, following the consolidation. In addition, because of my familiarity with the equity between B & O—East and B & O—West, I know that this means that an equivalent number of B & O employees must have been furloughed from the West End. Accordingly, approximately forty (40) B & O employees were furloughed. Based on my familiarity with conditions at the time, I conclude that these furloughs were essentially due to the absorption of the Western Maryland employees into the consolidated yard, and not to any other factor. I do not know of a single Western Maryland employee furloughed. In addition, my own experience in the yard, including my work as car retarder operator on the east-bound hump, indicates that the amount of new switching work following the consolidation was negligible. In fact, the amount of work since the consolidation, while variable, has remained at approximately the same

level it was before the consolidation, this despite the additional Western Maryland employees. *Mr. Delsignore's statement that there were only three furloughs of B & O employees is not true.* In addition, although I do not know the precise dates of recall of the many furloughed employees, my recollection is that they extended into the Spring of 1976.

Smith's affidavit, at 8–9. (Emphasis added).

In December of 1977, the above-named plaintiffs filed suit in the Circuit Court of Baltimore County.[2] At the defendants' behest, the case was removed to this Court in January of 1978. In December of 1978, the plaintiffs were permitted to amend their complaint. They alleged that the defendants conspired to violate their rights under various agreements and laws, and that the Union breached its duty of fair representation by entering into this agreement, the defendant railroads being equally liable because they "participated" in the negotiations. The gravamen of these two claims will be more closely detailed in the following discussion of the propriety of granting summary judgment.

## II. THE MOTION FOR SUMMARY JUDGMENT

### A. JURISDICTION

Both B & O and United Transportation contend this Court lacks jurisdiction because the plaintiffs have not exhausted their contractual remedies under the grievance machinery in the collective bargaining agreement and the administrative remedies as set out in § 3 First (i) of the Railway Labor Act, 45 U.S.C. § 151 *et seq.* (1954). This argument was urged by the defendants in their motion to dismiss. That argument was rejected in a letter dated March 29, 1978. Defendants have shown no more persuasive arguments to cause a review of the previous order.

Although a union member may not ordinarily resort to the courts for resolution of an employment related grievance before

2. See Circuit Court for Baltimore County at Law, Docket No. 109, Folio 253, File No. 97026.

exhausting the remedial procedures provided by the collective bargaining agreement and by the Railway Labor Act, *see, e. g., Andrews v. Louisville and Nashville Railroad Co.,* 406 U.S. 320, 92 S.Ct. 1562, 32 L.Ed.2d 95 (1972); *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), the courts have recognized several exceptions to this rule. In *Glover v. St. Louis-San Francisco Railway Co.,* 393 U.S. 324, 89 S.Ct. 548, 21 L.Ed.2d 519 (1969), the Court held that federal jurisdiction existed over an action brought by several employees which alleged that the employer and union had conspired to violate a collective bargaining agreement, even though those employees had not exhausted their administrative and contractual remedies. The Court reasoned that § 3 First (i) did not apply because that section governs disputes between *employees* and *employer,* and the plaintiffs in *Glover* had presented an action between employees on one side and *both the union and the management* on the other. Further, the Court noted that a proceeding under the Act would not include the union, and it would be unfair to restrict the plaintiffs to a remedy against only one of the two alleged conspirators. *Id.* at 329, 89 S.Ct. 548. With respect to the contractual remedies provided by the collective bargaining agreement, the Court found that it would be "futile" to force an employee to submit a claimed conspiracy to arbitration between the employer and the union, the very parties alleged to have defrauded him. *Id.* at 330–31, 89 S.Ct. 548.

■ As was stated in the order denying the defendants' earlier motion to dismiss, the reasoning of *Glover* controls. The plaintiffs are alleging precisely the same kind of union-employer conspiracy claimed to exist in *Glover,* and a requirement that they proceed through their administrative and contractual remedies would be equally as "futile."

■ Both defendants argue that the plaintiffs, having failed to prove their claims of conspiracy and unfair representation, are not entitled to the *Glover* exception. However, proof of these claims is not required to provide this Court with the jurisdiction recognized in *Glover.* The plaintiffs there had only to *allege* the existence of a union-employer conspiracy. Therefore, the plaintiffs here supplied this Court with a solid jurisdictional footing by their allegations of a *Glover*-type conspiracy.

## B. FACTUAL ISSUES

Defendants also contend that they should be granted summary judgment on the law of the case, under Fed.R.Civ.P. 56, absent any factual dispute.

■ The Fourth Circuit has prescribed a very strict standard which must be met before summary judgment may be granted. Not only can there be no dispute as to the evidentiary facts, but there cannot be any disagreement as to the inferences or conclusions which might be drawn from those facts. *See, e. g., Johns Hopkins University v. Hutton,* 488 F.2d 912, 918 (4th Cir. 1973), *cert. denied,* 416 U.S. 916, 94 S.Ct. 1622, 40 L.Ed.2d 118 (1974). Further, the party moving for summary judgment has the burden of clearly demonstrating that there is no genuine issue of fact, and any doubt as to the existence of such an issue will be resolved against it. *See, e. g., Phoenix Savings & Loan, Inc. v. Aetna Casualty & Surety Co.,* 381 F.2d 245, 249 (4th Cir. 1967). Finally, the party opposing the motion is entitled to all of the favorable inferences to be drawn from the evidence. *See, e. g., Cram v. Sun Insurance Office, Ltd.,* 375 F.2d 670, 674 (4th Cir. 1967); *Salmon v. Parke, Davis & Co.,* 520 F.2d 1359 (4th Cir. 1975).

To resolve the defendants' motions, this "strict" standard must be applied to this case. Although plaintiffs' amended complaint fills seventy-two pages, it can be distilled into essentially two claims. First, plaintiffs allege that the three defendants took part in a *conspiracy* to violate the Washington Job Agreement of 1936 (a national labor agreement to which the defendants are signatory), the collective bargaining agreement between United and B & O, United's constitution, the Railway Labor

Act, 45 U.S.C. § 151, *et seq.,* and the custom in the railroad industry that "the men follow the work."[3] Second, plaintiffs allege that United breached its *duty of fair representation* to its members and that the two railroads are also liable for the breach because they participated in the negotiations.

B & O argues that the deposition testimony has conclusively established that no conspiracy existed, that United did not breach its duty, and that even if it did, B & O should not be liable because it did not participate in the union's action. United restates the first two of B & O's arguments.

In *Harrison v. United Transportation Union,* 530 F.2d 558 (4th Cir. 1975), *cert. denied,* 425 U.S. 958, 96 S.Ct. 1739, 48 L.Ed.2d 203 (1976), the Fourth Circuit was faced with a similar issue. A railroad conductor, in an action against his union and his employer, alleged that they had conspired to deny him a proper grievance procedure, and that they were jointly liable for the union's breach of its duty of fair representation. *Harrison* provides this Court with the essential elements which the plaintiffs must prove to prevail on their two claims. As to the conspiracy allegation, the court in *Harrison* stated that "a civil conspiracy is a combination of two or more persons to accomplish an unlawful purpose, or to accomplish a lawful purpose by unlawful means." *Id.* at 561. Further, although the court affirmed a directed verdict for the defendant because the plaintiff had not put forth sufficient evidence, it suggested that "[t]he case might be a different one if [the plaintiff] had proved that Belt Line [the employer] and [the union] *acted in concert with the joint motive* to discriminate against the employee." *Id.* (emphasis added). The plaintiff here is attempting to present that "different case."

As to the breach of the duty of fair representation claim, the court stated:

A union must serve the interest of all members without hostility, discrimination, arbitrariness or capriciousness toward any. Although a union may exercise discretion in representing employees, it must act with complete good faith and honesty. This is settled law.

*Id.* In *Harrison,* the Court affirmed a finding that the union had breached this duty by failing to press the plaintiff/employee's grievances and by failing to notify him that it would no longer represent him in the procedures concerning those grievances.

■ Because of the strict standard which the Fourth Circuit has mandated that this Court exercise, the defendants' motions for summary judgment must be denied. As indicated above, much of the factual portrait of this case remains to be painted. With regard to the conspiracy claim, it has not been conclusively shown that United and the railroads did not act "in concert with the joint motive" to harm the plaintiffs. Although the depositions tend to show that no *express* agreement existed, it has been held that even absent an express agreement, if two persons pursue the same object, one performing one part of the act, and the other another part of the act so as to complete it with a view to the attainment of the object which they are pursuing, this will be sufficient to constitute a conspiracy. *See, e. g., Rutledge v. Elec. Hose & Rubber Co.,* 327 F.Supp. 1267 (C.D.Cal. 1971), *aff'd,* 511 F.2d 668 (9th Cir. 1972). Therefore, plaintiffs need not prove an express agreement among the defendants, and the presence of a nexus between the courses of conduct of United and the railroads is a factual question still in dispute.

■ Another element of a civil conspiracy is a purpose unlawful in itself, or in the means to be employed for its accomplishment. *See Koehler v. Cummings,* 380

---

**3.** This custom apparently dictates that in a consolidation of work forces such as the one which generated this litigation, the new men would "bring their work with them." The existence of such a custom has been disputed by the defendants. Plaintiffs allege that such a custom exists, and under it, the total amount of work formerly done by the Western Maryland men at their Knob Mount and Ridgely yards should have been transferred to the consolidated Cumberland yard. The amount of work so transferred appears to be in dispute. *See* Smith's affidavit, at 5.

F.Supp. 1294 (M.D.Tenn.1974). Plaintiffs have alleged that the defendants acted to violate both federal law and various contracts. Although much of the deposition testimony tends to indicate that the actions of the union and the railroads were proper, it must be noted that these statements came from persons who are or have been officers of one of the defendants. Because the veracity of this testimony is crucial, it would seem appropriate that these persons be fully cross-examined at trial. Further, the affidavit testimony of Smith squarely contradicts these assertions of innocence.

There are numerous other disputes as to the facts, and the inferences to be drawn from those facts. As indicated in the attempt at a factual summary above, the parties have disagreed over the extent of Smith's participation in the negotiations preceding the agreement, the degree of opposition, if any, he presented to the "numbers system," and as to whether or not the railroads fully disclosed their plans to shift some of the former Western Maryland work to yards other than the one at Cumberland. Moreover, there has been a conflict over the existence or non-existence of the custom that "the men follow the work," Smith stating that it is ingrained in the railroad trade, and several of the deponents claiming that they have never heard of it. Finally, the effect of the consolidation agreement on the economic fortunes of the members of the purported class of B & O men has been variously described. Deponent Delsignore has stated that only three B & O workers were furloughed, and those for only a brief time. Plaintiff Smith, however, has described the alleged widespread negative economic impact which the implementation of the "numbers system" has caused. Indeed, he bluntly states: "Mr. Delsignore's statement that there were only three furloughs of B & O employees is not true."

Because of the factual issues in dispute, summary judgment is inappropriate.

III. THE CLASS ACTION ISSUES

The plaintiffs have moved for the certification of a class under Fed.R.Civ.P. 23(c), of "all trainmen employed by the B & O at the time of the consolidation [January 5, 1976], as well as all B & O trainmen who have become employed at the Cumberland yard since the consolidation. . . ." Plaintiffs have submitted the seniority rosters for the East End and West End Cumberland Division of the B & O from 1975 through 1977 to show that over 500 B & O employees would be part of this proposed class. See Exhibit H to Plaintiffs' Motion for Class Certification. The defendants have put forth various arguments as to why the class should be certified. These will be discussed within the framework of an analysis of the requisites of Rule 23.

Although a detailed discussion of the requirements of Rule 23 is beyond the scope of this opinion, a brief summary of the salient aspects of the Rule may be helpful. Generally, the proponent of a class action must show that it is impractical to bring all of the members of the purported class before the court, Fed.R.Civ.P. 23(a)(1), that there are questions of law or fact common to the entire class, id. 23(a)(2), that the alleged claims or defenses of the representative are typical of the claims or defenses of the class, id. 23(a)(3), and that he will provide adequate representation to the absent members of the class, id. 23(a)(4). Further, the proposed class must be shown to fall within one of the three categories described in Fed.R.Civ.P. 23(b): (1) where a class action is necessary to avoid possible adverse effects on the opponents of the class or on the absent members of the class; (2) where the party opposing the class has acted or refused to act on grounds generally applicable to the class; or (3) where there are present questions of law or fact common to the class, and the judge finds that the class action device is superior to other available methods for the fair and efficient adjudication of the controversy. See generally, 1 H. Newberg, Class Actions § 1002; 7 Wright & Miller, Federal Practice & Procedure Civil : § 1759.

The "numerosity" requirement of 23(a)(1) is clearly satisfied. As indicated in the seniority roster submitted by the plaintiffs, there are at least 500 B & O employees in

the proposed class. Although joinder of these persons would be theoretically possible, it has been frequently held that impossibility of joinder is not required to meet this section of the rule. *See, e. g., Sweet v. General Tire & Rubber Co.*, 74 F.R.D. 333 (S.D.Ohio 1976); *Jenson v. Continental Financing Corp.*, 404 F.Supp. 806 (D.Minn. 1975). Rather, difficulty or impracticability of joinder is sufficient. Here, plaintiff has met his burden of proving that the joinder of all the persons in the proposed class would be impracticable. *See generally* 7 Wright & Miller, *supra* § 1762.

The (a)(2) requirement of "commonality" has similarly been satisfied. That provision prescribes that one or more issues of law or fact must be common to members of the class. They claimed existence of a conspiracy which economically harmed all the members of the class presents the typical example of common issues of law and fact. Indeed, many cases involving conspiracies against a class of persons have been found to have satisfied (a)(2). *See* 7 Wright & Miller, *supra* § 1763, at 605 n. 91 (collection of conspiracy cases).

The main thrust of the defendants' contention that section (a) of Rule 23 has not been satisfied centers on the "typicality" requirement of 23(a)(3) and the "adequacy of representation" requirement of 23(a)(4). They argue that Plaintiff Smith's claim is not "typical," and that he will not be an adequate class representative because a unique defense, estoppel, exists as to his claim. The defendants contend that because Smith took part in the negotiations leading up to the consolidation agreement, he is estopped to challenge its validity.

The "typicality" requirement focuses on the consideration of whether the representative's interests are truly aligned and consistent with those of the class members. Factual differences will not necessarily render a claim atypical if the representative's claim arises from the same event, practice or course of conduct that gives rise to the claims of the class, and is based on the same legal theory. *See* 7 Wright & Miller, *supra*, § 1764, at 610–14. For example, it has been held that the typicality requirement may be satisfied even though varying fact patterns support the claims or defenses of individual class members, *see, e. g., Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), and even though there is a disparity between the damages claimed by the representative and those claimed by the other members of the class. *See, e. g., Simon v. Westinghouse Elec., Inc.*, 73 F.R.D. 480 (W.D.Pa.1977); *Robertson v. NBA*, 389 F.Supp. 867 (S.D.N.Y.1975). Thus, the existence of a unique defense—as here—does not make a named plaintiff's claim atypical. Moreover, even if plaintiff Smith's individual claim is defeated by estoppel, it must be recalled that there are four other named plaintiffs who are not subject to that defense.

The "fairness and adequacy of representation" requirement of 23(a)(4) goes to the legal capacity of the plaintiff's counsel to represent the class as well as to the ability of the representative himself to pursue a course of conduct beneficial to the absent class members. In determining whether an aspiring representative or, as in this case, a group of representatives meets this standard, courts have found several factors to be significant. First, most courts have found that the representative must have interests sufficiently identical to those of the absent class members so that he will vigorously prosecute the suit on their behalf. *See* 1 H. Newberg, *supra*, § 1120. Further, some courts have stated that the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation. *See, e. g., Amos v. Board of Directors of Milwaukee*, 408 F.Supp. 765, 774–75 (E.D.Wis.), *aff'd*, 539 F.2d 625 (7th Cir. 1976); 7 Wright & Miller, *supra*, § 1766. Finally, some courts have required a showing that the representatives have interests which are not antagonistic or in conflict with the objective of those he purports to represent. *See, e. g., Gonzales v. Cassidy*, 474 F.2d 67 (5th Cir. 1973); *Feliciano v. Romney*, 363 F.Supp. 656 (S.D.N.Y.1973).

All of these factors are present in this case. Plaintiff Smith has demonstrated that he has and will continue to prosecute the suit on behalf of the class with vigor. Further, the attorneys for the plaintiffs have shown that they can ably handle the case. Finally, there has been no hint of antagonism between the named plaintiffs and the persons alleged to constitute the class, all of whom are certainly aware of this litigation, and could thus make known any grievances they may have known.

■ Having determined that Rule 23(a) has been satisfied, the putative class must be tested to see if it falls within one of the three sections of 23(b), described above. Because of the nature of the defendants' alleged misconduct, and because of the type of remedy sought, the case falls squarely within the ambit of Rule 23(b)(2). That provision concerns actions in which "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2). Plaintiffs ask that this Court declare the 1975 consolidation agreement void, issue an injunction and appoint a special master to supervise an "equitable adjustment and renegotiation" of the agreement, and award compensatory damages of three million dollars and punitive damages of three million dollars. Because of the request for monetary relief, the defendants have argued that 23(b)(2) is not applicable, confining it to suits for injunctive and declaratory relief. This argument is unpersuasive. The Advisory Committee Note to Rule 23 states that the (b)(2) designation is not appropriate where the "final relief relates *exclusively or predominantly* to money damages." *See* Advisory's Comm. Note, 39 F.R.D. 98, 102 (1966) (emphasis added). However, where, as here, the monetary relief is one element of the equitable remedy, and is simply ancillary to the injunctive or declaratory relief sought as the primary purpose of the suit, it will not prevent (b)(2) treatment. *See Robinson v. Lorillard Corp.*, 444 F.2d 791, 801–02 (4th Cir. 1971), *cert. dismissed*, 404 U.S. 1006–07 (1972); *Bowe v. Colgate-Palmolive Co.*, 416 F.2d 711, 720 (7th Cir. 1969). *See generally*, 7A Wright & Miller, *supra*, § 1775, at 22–23. Here, the essential remedy sought by the plaintiffs is a declaration that the consolidation agreement is invalid. The monetary relief is clearly ancillary to that request, and is no bar to this class being certified under 23(b)(2).

Aside from arguing that the requisites of Rule 23 have not been met, the defendants have suggested several other reasons why this case should not continue as a class action. First, they argue that the members of the Western Maryland Union are indispensable parties because any restructuring of the job allocation system would harm them, and that therefore the case should be dismissed under Rule 19(a) for a failure to join these persons. Defendants cite *English v. Seaboard Coast Line R. R. Co.*, 465 F.2d 43 (5th Cir. 1972), and *Banks v. Seaboard Coast Line R. R. Co.*, 51 F.R.D. 304 (N.D.Ga. 1970), to support this theory.

In *English*, a black employee brought a discrimination suit on behalf of a class of other black employees against his employer and his union. The Court of Appeals for the Fifth Circuit affirmed the district court's order that all of the white employees and union members must be joined under Rule 19(a). It rejected an argument by the plaintiffs that these persons could be represented by the defendant union. The Court reasoned that the trial judge had "broad discretion to order joinder under Rule 19," and thus sanctioned the order. In *Banks*, a similar suit was brought against the same employer and union by a black employee. The defendant union moved to dismiss for a failure to join the white persons who were employees and union members, and whose interests would have been harmed by an injunction altering the promotion and seniority systems of the employer. The district court dismissed, rejecting an argument that the defendant union could represent the absent white persons:

The Brotherhood has an equal duty to represent those members comprising the

class which plaintiff represents as well as the white employees whose interest would be realigned by any order granting relief to plaintiff. It thus appears that the white employees' interest is not the same as the Brotherhood's, and that the Brotherhood cannot fairly and adequately represent the interest of the class.

51 F.R.D. at 305.

Initially, it is significant to note that the *English* court stressed the wide discretion which a trial judge may exercise in ordering joinder. Before deferring to the decision of the "experienced Trial Judge," 465 F.2d at 47, the Fifth Circuit expressed doubt that joinder was, in fact, mandatory:

> there is no room now for an argument that in *all* circumstances in which the implementation of a remedy may conceivably affect the employment interests of white union members the District Court *must* find that the union alone does not adequately· represent its white membership.

Even in circumstances in which the union cannot adequately represent both black and white members because the remedy ultimately devised may entail an irreconcilable conflict between the interests of those members, it is clear that Rule 19(a) has never required joinder in every case in which "interests" of white persons may be adversely affected by a court decree terminating racially discriminatory practices. For example, within the context of public school desegregation there are innumerable instances in which white children, parents and teachers will be deprived of "rights" (for example, the "right" to attend a neighborhood school) without ever having had the *opportunity* to participate directly in the judicial proceedings which divest them of those "rights." Moreover, when these adversely affected groups have themselves taken the initiative by seeking to intervene under Rule 24, we have frequently declined to permit it. *St. Helena Parish School Board v. Hall*, 5 Cir., 1961, 287 F.2d 376, 379, cert. denied, 368 U.S. 830, 82 S.Ct. 52, 7 L.Ed.2d 33; *Horton v. Lawrence County Board of Education*, 5 Cir., 1970, 425 F.2d 735; *Bennett v. Madison County Board of Education*, 5 Cir., 1970, 437 F.2d 554. We perceive no basis for the supposition that a union's representation of its membership is different in principle from a school board's representation of the community. In either case the defendant is being compelled to eliminate the consequences of unlawful racial discrimination by taking measures inimical to the traditional advantages of white persons having a vested interest in the status quo.

*Id.* at 46-47.

■ This Court does not deem it prudent to exercise its discretion to order joinder of the Western Maryland union members. When an issue of compulsory joinder is raised, a court must determine whether the absent person's interest in the litigation is sufficient to satisfy one or more of the tests set out in the first sentence of Rule 19(a). *See generally* 7 Wright & Miller, *supra*, § 1604. Rule 19(a) states in pertinent part:

> (a) *Persons to be Joined if Feasible.* A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as ·a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reasons of his claimed interest.

The only cognizable interests the Western Maryland union men have is in the continuation of the "numbers system," which was created by the consolidation agreement. Plaintiff has alleged that this agreement was made as a result of an unlawful conspiracy, and because United breached its duty of fair representation. Should the plaintiffs prevail, therefore, the Western

Maryland men would not be able to argue for the inequity of declaring invalid an unlawful agreement. As stated by Judge Ward of the Southern District of New York in response to a similar argument: "There can be no vested interest in an unlawful practice." *Spirt v. Teachers Ins. & Annuity Ass'n of America*, 416 F.Supp. 1019, 1023 (S.D.N.Y.1976). On the other hand, should the plaintiffs lose, the "numbers system" will continue, and the Western Maryland men will not be adversely affected. Since the Western Maryland union members cannot legitimately assert a protectable interest, they need not be joined pursuant to Rule 19(a).

The Court also notes that the present litigation is a matter of common knowledge among the Western Maryland men. Should they insist to do so, they may be able to intervene by a motion under Rule 24. The fact that none of these persons has yet so moved tends to indicate that they do not feel that their interests are being threatened by this lawsuit.

The defendants also contend that the class should not be certified because plaintiffs have failed to show its "precise composition." They argue that only those B & O employees harmed by the numbers system should be considered as possible class members, and that plaintiffs have failed to prove which if any of the over 500 putative class members were actually injured. This argument must fail. First, the plaintiffs have alleged some type of economic injury to all of these persons. *See* the affidavit of Plaintiff Smith, quoted above. Second, it has been frequently held that in determining whether or not to certify a class, the trial court should not look to the merits of the plaintiff's case. *See, e. g., Kahan v. Rosenstiel*, 424 F.2d 161 (3d Cir.), *cert. denied*, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970); *Halverson v. Convenient Food Mart, Inc.*, 458 F.2d 927 (7th Cir. 1972). Therefore, the mere allegation of class-wide injury is sufficient to permit certification.

For the reasons detailed above, a class of all trainmen employed by the B & O

at the time of consolidation of yard operations at the Cumberland yard (January 5, 1976), as well as of all trainmen employed by the B & O at that yard since that time will be certified.

## IV. PLAINTIFF'S MOTION TO COMPEL DISCOVERY

On January 2, 1979, the plaintiffs filed a motion to compel the following documentary material under Fed.R.Civ.P. 37(a):

(1) Information on annual income and guaranteed income for each individual denoted by identification numbers on the seniority rosters of the B & O and Western Maryland employees at Cumberland for 1975, 1976 and 1977.

(2) The official train and/or car switching lists or print-outs generated at the data center operated by the railroads in Cumberland, particularly those for the period following the consolidation in early 1976.

(3) The official records of furloughs of B & O employees following the consolidation.

(4) Joint service lists for the East and West End division B & O employees for the period prior to the consolidation.

The defendants answer this motion, stating that they have complied with the request for the last three items to the fullest extent possible, and promising to provide plaintiffs with any additional documents as they become available. With respect to the first item—the annual incomes of the B & O and Western Maryland employees—defendants refuse to divulge this information, citing Fed.R.Civ.P. 26(c). They "submit that they have never voluntarily disclosed information concerning the incomes of employees to third parties and that doing so would constitute a violation of the legitimate right of privacy of Defendants' employees." Plaintiffs have replied to this answer, expressing dissatisfaction with defendants' "attitude toward discovery," and claiming that they have not released all of the information requested as to any of the four areas.

The defendants do not dispute that the last three items are discoverable, having apparently already made some attempt to provide the requested information. The parties clash, however, over whether these requests have been satisfied to the best of the defendants' ability. Under Fed.R.Civ.P. 37(a)(3), "an evasive or incomplete answer is to be treated as a failure to answer" in deciding whether or not to compel discovery. Here, it is unclear from the deposition and affidavit testimony whether or not the defendants have, in fact, acted evasively. Delsignore, the Western Maryland trainmaster, stated that there are switching lists at the data center in Cumberland, but that he was not certain as to the years for which those records have been preserved. *See* Delsignore deposition, at 92–93. Plaintiff Smith has asserted that he has seen the switching lists for 1976. *See* Smith affidavit, at 9. As to the furlough records and the joint service lists, it is unclear whether these records exist, or if they are accessible to the defendants.

 Defendants are reminded of the underlying philosophy of the Federal rules of discovery: that prior to trial every party to a civil action is entitled to the disclosure of all relevant information in the possession of any person, unless the information is privileged. *See* 8 Wright & Miller, *supra*, § 2001. Moreover, the party seeking to deny disclosure of any information has the burden of proving that that material is not discoverable. *See* 8 Wright & Miller, *supra*, § 2214. Accordingly, the defendants are ordered to produce the switching lists for the period following the consolidation, the post-consolidation, the records of furloughs of B & O employees, and the joint service lists for B & O employees at the time of the consolidation if such records do exist.

 With regard to the information on the annual and guaranteed incomes of the B & O and Western Maryland employees, defendants admit its existence, but claim that it is privileged matter. They argue that its release would violate these employees' rights of privacy. Fed.R.Civ.P. 26(b) provides for discovery of all matters "not privileged." Courts have generally held that the law of evidence governing the actual trial also determines whether something is "privileged" for purposes of discovery. *See United States v. Reynolds*, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953); *Boyd v. Gullett*, 64 F.R.D. 169 (D.Md.1974). Thus, information which would be inadmissable at trial because of an evidentiary privilege, would not be available in the course of discovery. Although there is some question as to whether the federal or state law on privilege should apply, *see Boyd, supra*, at 174–75, this issue need not be confronted here because it is clear that the "privilege" defendants seek to invoke is not recognized by either Maryland or federal law. Privileges generally recognized under federal law include those for marital communication, those between professional and client, and the Fifth Amendment privilege from self-incrimination. *See Lincoln Am. Corp. v. Bryden*, 375 F.Supp. 109, 111 (D.Kan. 1974); *McCormick on Evidence*, §§ 72 et seq. (2d ed. 1972). Defendants have not cited, and the Court is not aware of any cases finding an employer to have a privilege to refuse to disclose employees' income information. In an analogous situation in *United States v. Keeney*, 111 F.Supp. 233 (D.D.C.1953), *rev'd on other grounds*, 218 F.2d 843 (D.C.Cir.1954), a witness testifying before a Senate Subcommittee sought to invoke an employer-employee privilege. She argued that she could not answer a certain question because the rules and regulations of her employer—the United Nations—forbade her to do so. The court rejected this argument stating:

> Under the law of the United States privileged communications are strictly limited to a few well-defined categories, such as communications between attorney and client; clergyman and penitent, and physician and patient. In addition, there is a well-recognized privilege in respect to certain official documents, as well as a privilege accorded to law-enforcement officers to decline to reveal confidential sources of information. *The law does not recognize that communications between*

*an employer and employee are privileged, even though there may be a moral duty not to disclose such communications except when ordered by a competent tribunal.*

Id. at 234–35 (emphasis supplied). *See also United States v. Schoenheinz,* 548 F.2d 1389 (9th Cir. 1977) (no employer-stenographer privilege).

Maryland law also does not recognize the privilege which defendants seek to invoke. *Md.Cts. & Jud.Proc. Code Ann.* § 9–101 (1974) provides: "Unless otherwise provided in this subtitle . . . litigants . . are competent and compellable to give evidence." Although the traditional privileges of husband and wife and lawyer and client, among others, are recognized, *see id.* §§ 9–105 & 108, nowhere in the statute is there a privilege relied upon by defendants.

Absent a privilege, defendants are ordered to produce the records of the annual income and guaranteed income of the B & O and Western Maryland employees who worked at the Cumberland location in 1975, 1976 and 1977.

Accordingly, it is this 25th day of June, 1979, by the United States District Court for the District of Maryland, ORDERED:

1. The defendants' motion for summary judgment be, and the same is, hereby DENIED.

2. All trainmen identified in part III hereof be, and the same are, hereby certified as a class represented by plaintiffs pursuant to Fed.R.Civ.P. 23(c), and notice to said class members shall be given promptly by procedures to be agreed upon by counsel for all parties; and

3. Plaintiffs' motion to compel discovery be, and the same is, hereby GRANTED.