James T. **BENSON**, Plaintiff,

v.

**COMMUNICATION WORKERS OF AMERICA and Contel of Virginia, Inc.,** Defendants.

**Civ. A. No. 2:93cv552.**

United States District Court,
E.D. Virginia,
Norfolk Division.

Oct. 11, 1994.

912

Edwin Vieira, Jr., Manassas, VA, Hugh L. Reilly, Nat. Right to Work Legal Defense Foundation, Springfield, VA, for plaintiff.

G. Michael Price, Connor, Pennington & Price, Norfolk, VA, Gerard C. Boyle, James B. Coppess, Boyle, Tyburski, Toll & Rosen-

blatt, Washington, DC, for defendant Communications Workers of America.

## MEMORANDUM OPINION AND ORDER

MacKENZIE, District Judge.

This matter is before the Court on objections to the United States Magistrate Judge's Report and Recommendation entered on June 24, 1994.

### I. FACTS AND PROCEDURAL HISTORY

Under § 9(a) of the National Labor Relations Act (NLRA), defendant Communications Workers of America (CWA) was designated as the exclusive representative for a bargaining unit of co-defendant Contel of Virginia, Inc.[1] employees. James Benson, the plaintiff, and Barbara Kirker are and have been members of this bargaining unit of hourly employees at all times relevant to this dispute. CWA and Contel entered into a Collective Bargaining Agreement (the Agreement) that specifies the terms under which the members of this bargaining unit are employed. The Agreement contains a dispute resolution procedure, known as a "grievance," which specifies several steps at which Contel and CWA must meet in an effort to resolve the dispute between themselves, ultimately leading to a hearing before an arbitrator if these steps are unsuccessful.

Upon the posting of a "Notice of Job Opening" for a Service Technician position that had become available, both Benson and Kirker applied for the position. A clause in the Agreement between Contel and CWA required Contel to select the "best qualified senior applicant." Although Kirker had been employed by Contel longer than Benson, Benson was selected for the position. Kirker then filed a grievance with CWA.

Benson brought this action claiming that CWA breached its duty of fair representation owed under § 9(a) of the NLRA in pursuing the interests of Kirker to Benson's detriment. The alleged breach occurred in CWA's pursuit of a promotion bypass griev-

---

1. Contel agreed to be bound by the terms of any order or injunction issued by the Court and was relieved of its obligation to appear further in this action by Stipulated Consent Order entered November 11, 1993, by Judge Rebecca Beach Smith.

914

ance on behalf of Kirker without providing Benson notice of or opportunity to be heard at any stage of the grievance or at arbitration. The grievance resulted in an arbitration award in favor of Kirker and in Benson's subsequent demotion. Benson claims that Contel is derivatively in breach of the Collective Bargaining Agreement by following the grievance award and assigning Kirker to the position for which Benson had originally been selected. Benson alternatively claims that, if CWA has met its obligations under the duty of fair representation, then his rights under the First and Fifth Amendments to the Constitution have been violated. Benson seeks declaratory, injunctive, and compensatory relief.

This case was originally filed on May 28, 1993. On January 10, 1994, both Benson and CWA filed motions for summary judgment. After a hearing on the issues, Magistrate Judge William T. Prince filed proposed recommendations for disposition of the summary judgment motions on June 24, 1994. The Magistrate's Report and Recommendation recommended that CWA's motion for summary judgment be granted and that plaintiff's motion be denied.

The United States Code provides that if a party serves and files written objections to the Magistrate Judge's Report and Recommendation, the District Judge is required to make a *de novo* determination of those portions of the report to which objection is made, *see* 28 U.S.C. § 636(b)(1), and either affirm, reject, or modify the Magistrate Judge's recommendation.

After plaintiff filed objections to the Report and Recommendation and CWA responded, this Court heard oral arguments on September 23, 1994. The undersigned Senior United States District Judge has examined the record, heard oral argument from both counsel, and has considered the record and objections to the Magistrate Judge's Report and Recommendation *de novo*. For the reasons stated below, the Court agrees with the Magistrate Judge's determinations regarding those portions of the Report and Recommendation to which plaintiff objected. Hence, the Report and Recommendation

filed by Magistrate Judge Prince on June 24, 1994 is accepted and affirmed as filed.

## II. *DISCUSSION*

### A. *Duty of Fair Representation*

■ The Magistrate Judge found that CWA acted in reliance upon an earlier interpretation of the meaning of "best qualified senior applicant" that had been rendered in an arbitration concerning the same parties to the collective bargaining agreement. The standard to be applied is whether CWA's actions were "so far outside a wide range of reasonableness as to be irrational." *Airline Pilots Ass'n, Int'l v. O'Neill,* 499 U.S. 65, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991). CWA's reliance on the earlier arbitrator's decision was not arbitrary, and therefore, CWA's pursuit of the Kirker grievance was reasonable, despite the union's indifference to Benson's position. Specifically, the union's duty of fair representation did not require it to do more than articulate and pursue a non-arbitrary interpretation of the Agreement although the successful pursuit of its interpretation would detrimentally affect one of its members. The Magistrate Judge also analyzed a myriad of cases addressing a union's duty to give notice to adversely affected members and did not find a clear, *per se* rule requiring it.

Benson objected to the Magistrate Judge's finding by arguing that it does not take into account the basic obligation of CWA to represent all employees in the bargaining unit. Since Benson was awarded the position, he had rights under the Agreement which CWA had a fiduciary duty to protect. Benson further argues that CWA's failure to take his interests into consideration and its reliance on the previous arbitrator's decision was unreasonable and arbitrary.

■ Benson misunderstands the role of a union in its exercise of the power to speak for its employees. It would almost always be impossible for a union to represent all employees after a grievance has been filed. A grievance normally involves parties on opposite sides of an issue and the union could not promote both positions. The union has the right and obligation to advance collective interests, in doing so, it must also choose be-

tween sometimes opposing interests. *Humphrey v. Moore*, 375 U.S. 335, 349–50, 84 S.Ct. 363, 371–72, 11 L.Ed.2d 370 (1964). Therefore, the Magistrate Judge correctly rejected the argument that the duty of fair representation prevents the union from forcefully advocating a single interpretation of the Agreement that the union has reasonably determined benefits the group as a whole. CWA did not · breach its duty to Benson when it represented Kirker.

Benson also argues that CWA had a duty to provide him with notice and an opportunity to seek to participate in the arbitration. He objects to the Magistrate Judge's finding that there was no duty of fair representation violation because there is no *per se* rule mandating notice and hearing. He states that a reasonably prudent person could not conclude that notice is not required. Benson relies on *Steele v. Louisville and Nashville R.R.*, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944) for the proposition that whenever necessary a union must give notice and hearing to its members. However, *Steele* is distinguishable from the present case because the statement was made in reference to non-union or minority members of the craft, in the context of discrimination. *Steele*, 323 U.S. at 204, 65 S.Ct. at 232–33.

### B. *Breach of Contract*

The Magistrate Judge found that in order to prevail, Benson must not only demonstrate a breach of duty by the union, but also show that his demotion was contrary to the contract. However, even if he had found that CWA violated its duty, the arbitration decision was still not erroneous. Benson's argument that he was prejudiced by not being called to participate in the arbitration process was not convincing because the arbitrator's decision shows he was fully aware of the nature of Benson's qualifications. Benson's proffered testimony would not have impacted the arbitrator's decision based on his interpretation of the Agreement.

Benson specifically objects to the breach of contract issue because he was unable to testify before the arbitrator. Benson argues his testimony could have established the relationship between experience and qualifications listed on the job posting and the arbitrator could have ruled in his favor. Further, the testimony of Contel did not adequately present a case for Benson, although he could have explained the connection had he testified.

However, the arbitrator was fully aware of the nature of Benson's qualifications because Benson actively assisted Contel in preparing its case for arbitration. Evidence that Benson says was missing at the arbitration was presented by Contel. Presumably, the arbitrator would be more interested in Contel's assessment of Benson than in Benson's assessment of himself. Furthermore, there is no evidence to indicate that he was inclined to intervene in the arbitration for the purpose of bolstering the Company's case. Benson determined that the best protection of his interests lay in helping Contel prepare its case.

### C. *The Constitutional Claim*

■ Benson asserts as a final theory for relief that if there was no breach of the duty of fair representation in CWA's failure to give Benson notice of and opportunity to participate in the arbitration, then § 9(a) of the NLRA is unconstitutional as applied. The Magistrate Judge concluded that Benson's constitutional arguments are meritless. The heart of Benson's argument is that he is constitutionally entitled to represent himself, independently from his bargaining unit and contrary to the collective bargaining scheme established by Congress in enacting the federal labor laws. It is well-settled, however, that the union's duty of fair representation, prohibiting it from acting arbitrarily, discriminatorily, or in bad faith toward any member, adequately protects the individual's interests.

### III. *CONCLUSION*

Upon *de novo* review of the plaintiff's objections to the Magistrate Judge's Report and Recommendation, this Court has determined that plaintiff has failed to show that the arbitrator's decision was erroneous, nor that CWA breached its fiduciary duty. In addition, plaintiff's alternative constitutional claim is meritless. For the foregoing rea-

sons, the Report and Recommendation filed by Magistrate Judge Prince on June 24, 1994 is accepted and affirmed as filed. Defendants' motion for summary judgment is GRANTED.

Plaintiff is advised that she may appeal from this final order by forwarding a written notice of appeal to the Clerk of the United States District Court, U.S. Courthouse, 600 Granby Street, Norfolk, Virginia 23510, which said written notice must be received by the Clerk within thirty (30) days of the date of this final order.

It is so ORDERED.

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

PRINCE, United States Magistrate Judge.

### Order of Designation

United States District Judge John A. MacKenzie, by an Order entered February 14, 1992, designated the undersigned magistrate judge to conduct a hearing and to submit to a judge of the court proposed recommendations for disposition by the judge of Plaintiff's Motion For Summary Judgment and defendant Communication Workers of America's Motion For Summary Judgment, both filed on January 10, 1994, under Rule 56 of the Federal Rules of Civil Procedure.

A hearing was held on February 15, 1994, at which Edwin Viera, Jr., Esquire, and Hugh L. Reilly, Esquire, appeared for plaintiff; and James B. Coppess, Esquire, Gerard C. Boyle, Esquire, and G. Michael Price, Esquire, appeared on behalf of defendant Communications Workers of America.[1]

### Nature of the Case

This case is an action against an exclusive bargaining representative for breach of the duty of fair representation, owed under § 9(a) of the National Labor Relations Act, 29 U.S.C. § 159(a), and derivatively for breach of contract against an employer under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185. Alternatively, if the duty of fair representation has been met, then § 9(a) is alleged to be unconstitutional as applied under the First and Fifth Amendments.

### Background

Under § 9(a) of the NLRA, CWA has been designated as the exclusive representative for a bargaining unit of Contel employees. 29 U.S.C. § 159(a). James Benson and Barbara Kirker are and have been members of this bargaining unit of hourly employees at all times relevant to this dispute. CWA and Contel entered into a Collective Bargaining Agreement ["the Agreement"] that specifies the terms under which the members of this bargaining unit are employed. The Agreement contains a dispute resolution procedure, known as a "grievance," which specifies several steps at which Contel and CWA must meet in an effort to resolve the dispute between themselves, ultimately leading to a hearing before an arbitrator if these steps are unsuccessful. Benson has brought this action claiming that the Communications Workers of America ("CWA" or "the union"), his exclusive bargaining representative, breached its duty of fair representation owed under § 9(a) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 159(a), in pursuing the interests of Kirker to Benson's detriment. The alleged breach occurred in CWA's pursuit of a promotion bypass grievance on behalf of Kirker without providing Benson notice of or opportunity to be heard at any stage of the grievance or at arbitration. The grievance resulted in an arbitration award in favor of Kirker and in Benson's subsequent demotion. Benson claims that Contel is derivatively in breach of the Collective Bargaining Agreement by following the grievance award and assigning Kirker to the position for which Benson had originally been selected. Benson alternatively claims that, if CWA has met its obligations under the duty of fair representation, then his rights under the First and Fifth Amendments to the Constitution have been violated. Benson seeks

---

1. Contel of Virginia, the other named defendant, agreed to be bound by the terms of any order or injunction issued by the Court and was relieved of its obligation to appear further in this action by Stipulated Consent Order entered November 11, 1993, by Judge Rebecca Beach Smith.

declaratory, injunctive, and compensatory relief.

Jurisdiction in this Court is proper under 28 U.S.C. §§ 1331 and 1337(a) in that the claims for relief concern the interpretation and application of § 9(a) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 159(a), an Act of Congress regulating commerce, and the First and Fifth Amendments to the Constitution. The Court also has jurisdiction under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185.

The case is before the Court on motions for summary judgment simultaneously filed by Benson and CWA under Rule 56. The parties agree that there are no material facts in dispute, and each contends entitlement to judgment as a matter of law.[2]

### Facts

The material facts of this case are not in dispute. Contel recognizes CWA as the exclusive representative, under § 9(a) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 159(a), for a bargaining unit comprised of Contel's hourly employees. The unit includes Service Technicians and Facilities Technicians, and Benson and Kirker have been members of the bargaining unit at all times material to this case. As the unit's exclusive representative, CWA entered into a collective bargaining agreement with Contel that covers the employment conditions of the members of the bargaining unit. Contel and CWA have entered into a series of such agreements, including the version at issue in this case which was in effect from February 1, 1990, through January 31, 1993 ("the Agreement"). The Agreement specifies, among other things, the procedures that Contel is required to follow in selecting employees for job assignments and the process for resolving disputes.

On January 18, 1990, Contel posted a "Notice of Job Opening" for a Service Technician position that had opened up at its Virginia Beach facility. (CWA ex. H–1.) The Notice listed "Qualifications" for the position as well as "Additional Qualifications Considered a Plus," and invited interested Contel employees to file an application with the Contel Human Resources Representative. A number of employees applied, and the pool of applicants was narrowed to four, including Benson and Kirker. Benson and Kirker were both Facilities Technicians when they applied for the Service Technician position. All four of the applicants were interviewed by a Contel management team comprised of Al Ryder, Laurie Blanton, Gene Lowery, and Joe Ackaway. (Transcript of Arb. Hearing, at p. 42.) Benson was assigned to the position, despite his having less seniority than two of the other applicants.[3]

The key clause of the Agreement required Contel to select the "best qualified senior applicant" for the Service Technician position. "Seniority" is addressed in Article 18, § 18–2, which states in relevant part that "[i]n selecting employees covered by this Agreement for assignments to higher rated non-management classification, the best qualified senior applicant will be considered to fill the particular vacancy." Article 23, entitled "Job Advertisement," § 23–6 states, "When the supervisor and a Human Resources Representative have selected the best qualified senior applicant, no further interviews will be conducted." Kirker was the senior applicant.

The Agreement contains a grievance provision at Article 15, where "grievance" is defined as "a Union claim by an employee and/or Union that the Company has violated a provision of the Agreement and has thereby deprived him of a right or a benefit herein

---

**2.** Putting forth a "deference to arbitration theory" that requires the matter be sent back to arbitration for a proper decision based on all the facts, Benson submits that the merits of the Kirker grievance are not appropriate for summary judgment. He contends that "to the extent that CWA defends its actions on the supposed substantive merits of the grievance, CWA is not entitled to judgment as a matter of law." (Pltf's Mem. in opp., docket entry #21, at 6.) The relevance of this contention will be addressed

more fully *infra,* but the record does not contain any disputes of fact. Benson's contention simply points out that it would be inappropriate for the Court to make any finding as to what the arbitrator *would have* found given a full set of facts.

**3.** Of these two, Richard Noble could not have been assigned to the position under the terms of the collective bargaining agreement because it would represent a demotion for him.

expressly conferred upon him." Article 15 specifies a grievance procedure to be followed by CWA and Contel that encourages the resolution of disputes between them at the earliest step possible. Article 16 of the Agreement allows CWA to refer grievances which are not settled to its satisfaction to an arbitrator for a hearing. CWA pursued a grievance on behalf of Kirker, challenging Contel's selection of Benson. Contel and CWA met at the required steps in the grievance procedure but were unable to resolve the grievance, and CWA submitted a request for arbitration. Arbitrator Norman Harlan was selected to arbitrate the Kirker grievance, and a hearing was held on December 2, 1992. Contel and CWA were represented by counsel at the arbitration hearing, where witnesses were presented and documentary evidence was introduced and witnesses were cross-examined. Benson was not present at the hearing, nor was there any representative present on Benson's behalf.

Before Arbitrator Harlan, CWA took the position that "best qualified senior applicant" required Contel to select Kirker, because Benson had "less seniority and less Contel schooling." (CWA ex. G2–A and G2–B.) CWA argued that a previous arbitration award by Arbitrator Robert J. Ables controlled and required the rejection of Management's contention that it can select the best qualified person, irrespective of seniority. (Harlan dec'n at p. 6.) Contel argued that the Agreement required the selection of the senior applicant only if that applicant is as well qualified or nearly as qualified as the other applicants, and Benson's vast experience in the telecommunications industry gained in his 20 years at RCA gave him superior qualifications that far outweighed Kirker's edge in seniority. (Arb. hearing trans. at p. 9.) Following the hearing, Contel and CWA submitted briefs to Arbitrator Harlan, who sustained the grievance by written decision entered March 20, 1993. Harlan's decision stated that "based upon the evidence and the applicable Contractual language [in the collective bargaining agreement] the Service Technician vacancy should have been awarded to [Kirker]." (Harlan dec'n at p. 40.) Kirker possessed all of the "Qualifications" as well as all of the "Addi-

tional Qualifications" listed in the Notice of Job Opening.

Pursuant to this decision, Contel removed Benson from the Service Technician position and replaced him with Kirker, effective March 20, 1993. Benson was returned to his former position as a Facilities Technician, with a correspondingly lower rate of pay.

Benson did not participate or attempt to participate, either on his own behalf or through legal counsel or other representative selected by him, in any stage of the Kirker grievance or the Kirker arbitration. (CWA's Response to Req. for Admission No. 24.) CWA did not give Benson notice of or an opportunity to participate in:

(i) its decision to pursue the Kirker grievance.

(ii) steps 1–3 of the Article 15 proceedings concerning the Kirker Grievance.

(iii) the selection of the arbitrator to decide the Kirker grievance;

(iv) the Kirker grievance.

(*Id.* Nos. 26–29.) CWA also did not give Benson notice that, in pursuing the Kirker grievance and Kirker arbitration, CWA was advancing and did advance a position contrary to and in conflict with Benson's interests as the person who had been selected by Contel for the Service Technician position. (*Id.* No. 33.) Finally, "CWA did not give Benson notice, advise him, or suggest to him that in pursuing the Kirker grievance and arbitration, CWA was advancing a position contrary to and in conflict with Benson's interests as the person whom Contel had selected for the Service Technician position and that he could or should seek his own legal counsel or other representative with respect to the Kirker Grievance and the Kirker Arbitration." (*Id.* No. 34.)

In short, CWA did not do anything to alert Benson as to its position as to which employee Contel was required to select under the Agreement. Benson did not participate in the grievance and arbitration process, he was not present at the hearing before Arbitrator Harlan, and he did not become aware of the Kirker arbitration hearing until shortly after it was held. (Decl. of J. Benson at p. 2.) As a result of Arbitrator Harlan's decision, Ben-

son was removed from the Service Technician's position and returned to the Facility Technician's position that he had previously held. (*Id.*) Up until the time that he was informed of Arbitrator Harlan's decision, Benson was unaware that the successful prosecution of the Kirker grievance and arbitration by CWA could lead to his demotion because he believed that a junior man would have to take the demotion. (*Id; * Benson Dep. at 86.)

Al Ryder, Contel's Facilities Supervisor and a member of the interview team that selected Benson, was among those persons who testified at the Arbitration Hearing. In his deposition, Benson agreed that Ryder was the person in management who was in the best position to know Benson's work attributes. (Benson Dep. at 47.) In addition, Benson knew that Contel's representatives would be going to the arbitration hearing to defend their decision to select him for the Service Technician position, so he provided them with everything that he could think of to aid them in the preparation of the case. He stated that he knew that the Contel representatives "were going to try a case that the outcome would affect me, so I would want to try and prepare them the best I could. So I don't recall leaving anything out." (*Id.*) Benson also stated his belief that, if called to testify at the arbitration hearing, he could have made it clear that he was the more qualified applicant. He would have done so by fleshing out his qualifications in the documents submitted to the arbitrator by providing more information, more specifics, and more particulars about his experience, work history, and qualifications. (*Id.* at 88.)

At the Arbitration Hearing, all of the application packages that Contel considered in evaluating the applicants were submitted into evidence, along with the questions that the Contel representatives asked at the applicant interviews. Also submitted were performance comparisons between Benson and Kirker, the Contel management team's ranking of the candidates, and notes of the selection process. Al Ryder testified as to the details of the selection process, and he stated that Benson was chosen "[b]ased on his pre-vious experience as being a manager for RCA." (Arb. Hearing Trans. at 53.) After providing a detailed description of the Facilities Technician position, Ryder gave specific details as to Benson's previous experience that would be beneficial in the position and made him the superior candidate. Ryder stated that, in evaluating the candidates for the Service Technician position, Contel was looking for someone with the fitness and ability to do this type of work and Benson was "head and shoulders" above the other three candidates. "Benson was much more impressive in his conduct during the interview, his presentation of his answers, his background that he had." (*Id.* at 58.) Moreover, Ryder opined that Benson had a better general presentation of himself and was more convincing that he knew how to handle the problems that could be expected, and Benson was, overall, "much superior" to the other candidates. (*Id.*)

Contel's internal comparison between the two candidates (CWA Ex. I–5), prepared for the grievance proceedings, showed that both candidates had an identical overall score on their Contel performance evaluations and that Kirker had more Contel training.

Norman Gleichman, the attorney who represented CWA during the Kirker arbitration, did not consider how the outcome of the case would affect Benson, because the union's obligation is to enforce the terms of the contract and the union's position was that the terms of the agreement required the selection of Kirker. (Gleichman Dep. at 18.) Gleichman further declared that because Benson was not a party to the arbitration and, because the purpose of the arbitration is to resolve a dispute between two parties, any attempt by Benson to participate in the arbitration hearing would have been "similar to someone walking off the street into a court room where the person is not a party to the dispute and asking to be heard." (Gleichman Dep. at 53.) Gleichman also stated that this issue had never arisen, so there was no practice on the participation by a non-party in an arbitration proceeding, even where that non-party had a definite interest in the outcome of the arbitration. (Gleichman Dep. at 54.)

## The Motions

As set forth in Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when the moving party can show by affidavits, depositions, admissions, answers to interrogatories, the pleadings, or other evidence, that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The standard for consideration of the parties' motions for summary judgment was recently reiterated in *Tuck v. Henkel Corp.*, 973 F.2d 371, 374 (4th Cir. 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1276, 122 L.Ed.2d 671 (1993) (citations omitted):

> Summary judgment is appropriate in those cases where there is no genuine dispute as to a material fact and the moving party is entitled to a judgment as a matter of law. We must draw any permissible inference from the underlying facts in the light most favorable to the party opposing the motion. Summary judgment is appropriate only where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.

*Id.* at 374. With this standard in mind, the Court will now address the parties' motions.

## Discussion

### I. The First and Third Claims

Benson's basic complaint is that CWA breached its duty of fair representation in pursuing the Kirker grievance without providing Benson notice and an opportunity to participate, leading to Contel's derivative breach of the collective bargaining agreement in implementing the arbitrator's award, which was erroneous and tainted by CWA's breach. Clarifying his position, Benson's Amended Complaint alleges that the Arbitration Award was erroneous in finding that Kirker was as qualified or nearly as qualified as Benson. (Amended Complaint at ¶ 8A.) Benson further alleges that CWA's failure to give Benson notice of and an opportunity to participate in the grievance and arbitration process contributed to this erroneous decision, in that Arbitrator Harlan was not presented with crucial testimony from Benson

concerning his experience. (Amended Complaint at ¶ 8B.)

In his First Claim for Relief, Benson alleges that CWA failed to represent Benson at all stages of the grievance and arbitration process, and failed to provide him with and deprived him of an opportunity to be heard at any stage of the grievance and arbitration process. Benson claims that these actions were arbitrary and without rational basis, constituting a *per se* violation of the duty of fair representation.

Similarly, in his Third Claim, Benson alleges that CWA violated its duty of fair representation to him, or abridged his constitutional rights, by denying him notice of and an opportunity to be heard on its actions. Benson claims that, under these circumstances, the grievance, its referral to arbitration, and the Arbitration Award all violated the Collective Bargaining Agreement. Benson further alleges that he would prevail on the merits of the grievance were the grievance heard in a fair hearing in any forum. Finally, he claims that both CWA and Contel are in violation of the Collective Bargaining Agreement by relying on and enforcing the erroneous Arbitration Award to Benson's detriment.

Benson's claim presents a "hybrid" fair representation/breach of contract claim against the union and the employer. *See Del Costello v. International Brotherhood of Teamsters,* 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983). The claim against CWA is for breach of the duty of fair representation, and the derivative claim against Contel is for breach of contract in that Contel has violated the Agreement by enforcing the erroneous arbitration award. *See* 29 U.S.C. § 159(a); 29 U.S.C. § 185. Congress has specified in § 203(d), 29 U.S.C. § 173(d), that "(f)inal adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes." In a case such as this, where the collective bargaining agreement provides a procedure for the settlement of disputes between the employer and the union through discussion and arbitration, the settlement reached at arbitration will be binding and respected by the courts unless there is substantial reason to believe that a breach of

duty by the union contributed to an erroneous decision. *See Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 568, 96 S.Ct. 1048, 1058, 47 L.Ed.2d 231 (1976). A § 301 suit against the employer and a fair representation claim against the union are "inextricably interdependent." *United Parcel Service, Inc. v. Mitchell,* 451 U.S. 56, 66–67, 101 S.Ct. 1559, 1565–66, 67 L.Ed.2d 732 (1981) (Stewart, J., concurring in the judgment). In order to prevail and avoid the Arbitrator's interpretation of the Agreement, Benson must show both that his demotion was contrary to the Agreement and that the union breached its duty to him. *Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry,* 494 U.S. 558, 564, 110 S.Ct. 1339, 1344, 108 L.Ed.2d 519 (1990); *Del Costello v. Teamsters,* 462 U.S. 151, 164–65, 103 S.Ct. 2281, 2290–91, 76 L.Ed.2d 476 (1983); *Hines,* 424 U.S. at 571, 96 S.Ct. at 1059–60. Benson thus must show that CWA breached its duty of fair representation to him, that Arbitrator Harlan's decision was erroneous as a result, and that the CWA's breach substantially contributed to the erroneous decision.

## A. The Duty of Fair Representation

■ The general standard governing a union's conduct as exclusive representative is that it owes all members of the bargaining unit the duty of fair representation, which is breached by the union only if its conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith. *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). The Supreme Court recently clarified the breadth of this duty:

> We hold that the rule announced in *Vaca v. Sipes,* 386 U.S. 171, 190 [87 S.Ct. 903, 916–17, 17 L.Ed.2d 842] (1967)—that a union breaches its duty of fair representation if its actions are either "arbitrary, discriminatory, or in bad faith"—applies to all union activity, including contract negotiation. We further hold that a union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a "wide range of reasonableness," *Ford Motor Co. v. Huffman,* [345]

U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953), as to be irrational.

*Air Line Pilots Ass'n, Int'l v. O'Neill,* 499 U.S. 65, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991). The union's conduct in pursuing the Kirker grievance and arbitration in opposition to Benson's interest in holding the Service Technician position must therefore be evaluated in the light of this highly deferential standard.

With this standard in mind, Benson claims that, in pursuing the Kirker grievance, CWA took actions that were adverse to Benson's employment interests, and in failing to provide Benson with notice and an opportunity to be heard, CWA's actions were "arbitrary and without rational basis," in violation of its duty. (Amended Complaint, at ¶¶ 11–13.) The central issue is thus whether CWA's failure to give Benson notice of and an opportunity to be heard on the Kirker grievance and arbitration was "so far outside a wide range of reasonableness as to be irrational" under *O'Neill.*

■ The union not only has the right but also the obligation to advance the collective interests of all of its members, and in doing so must necessarily choose between sometimes opposing interests. *Humphrey v. Moore,* 375 U.S. 335, 349–50, 84 S.Ct. 363, 371–72, 11 L.Ed.2d 370 (1964). A "union may ... handle [a] grievance in a particular manner for a multitude of reasons," most especially for the purpose of "benefitting the membership at large." *Griffin v. Automobile Workers,* 469 F.2d 181, 183 (4th Cir. 1972). Among the permissible reasons that a union may adopt in pursuing a grievance is the furtherance of the union's "legitimate interest in presenting a united front ... and in not seeing its strength dissipated and its stature denigrated by [individuals] within the unit separately pursuing what they see as separate interests." *Emporium Capwell Co. v. Western Addition Community Org.,* 420 U.S. 50, 70, 95 S.Ct. 977, 988, 43 L.Ed.2d 12 (1975). CWA's pursuit of an interpretation of the Agreement that favored seniority was not behavior "so far outside a wide range of reasonableness as to be irrational" under *O'Neill,* despite the inevitable harm to one employee for the benefit of another.

■ The true thrust of Benson's complaint, however, is not that CWA acted arbitrarily by merely pursuing an interest adverse to him, but rather that CWA acted arbitrarily in the manner in which it pursued that position. The central issue is whether CWA's pursuit of the Kirker grievance and arbitration, without ever giving Benson notice of or an opportunity to be heard on the proceedings, either before CWA itself or before Arbitrator Harlan, violated its duty of fair representation. In other words, the question is whether the union's duty of fair representation required it to do more than articulate and pursue a non-arbitrary interpretation of the collective bargaining agreement when the successful pursuit of its interpretation would detrimentally affect one of its members.

The union's duty to give notice to adversely affected members has been addressed in a number of decisions, but no clear rule establishing notice as a *per se* rule has emerged. For example, the Fourth Circuit has held that a breach of the duty of fair representation may be found where the union drops a grievance that it had been pursuing on behalf of a member without giving that member notice, even where the grievance itself was dropped for permissible good faith reasons. *Harrison v. United Transportation Union*, 530 F.2d 558, 561 (4th Cir.1975), cert. denied, 425 U.S. 958, 96 S.Ct. 1739, 48 L.Ed.2d 203 (1976). In *Harrison*, however, the union's constitution and by-laws required that the employee receive notice so that he could pursue an appeal on his own, and the Court held that a conscious decision by the union not to give such notice would therefore constitute arbitrary action. *Id.* at 561–62. There is no similar notice requirement in the present case, nor would Benson have had any such opportunity to pursue an appeal on his own under the terms of the Agreement.

As authority directly addressing the issue of whether CWA violated its duty of fair representation by not providing Benson with notice, Benson offers and relies heavily upon *Clark v. Hein–Werner Corp.*, 8 Wis.2d 264, 99 N.W.2d 132 (1959), *cert. denied*, 362 U.S. 962, 80 S.Ct. 878, 4 L.Ed.2d 877 (1960). In *Clark*, the Supreme Court of Wisconsin held

that an arbitration award should not be binding upon certain adversely affected employees whose interests were diametrically opposed to the position espoused by the union where those employees were not given notice of the arbitration hearing. The issue at arbitration concerned the interpretation of the seniority clause of a collective bargaining agreement, and the union's successful pursuit of its position resulted in the demotion of several employees. The Court held "where the interests of two groups of employees are diametrically opposed to each other and the union espouses the cause of one in the arbitration, it follows as a matter of law that there has been no fair representation of the other group.... even though ... the union acts completely objectively." 99 N.W.2d at 137. The Wisconsin Court further declared that, even though the employer's position at arbitration was identical to the plaintiff's, "the plaintiffs were entitled to notice of the hearing, and an opportunity to intervene, as a matter of sound labor policy." *Id.* at 138.

In *Miller Brewing Co. v. Brewery Workers Local Union No. 9*, 562 F.Supp. 1368 (E.D.Wis.1983), the district court declared that "*Clark* is not good law." *Id.* at 1373 *aff'd in part* and *rev'd in part* on other grounds, 739 F.2d 1159 (7th Cir.1984), *cert. denied*, 469 U.S. 1160, 105 S.Ct. 912, 83 L.Ed.2d 926 (1985). *Miller* noted that *Clark* was decided seven years before the United States Supreme Court announced the current standard for evaluating the union's execution of its duty in *Vaca*, under which the union breaches its duty of fair representation only where its conduct toward a member is "arbitrary, discriminatory, or in bad faith." *Id.*, citing *Vaca*, 386 U.S. 171, 87 S.Ct. 903. Benson argues that in deciding *Miller*, the court misread *Clark*, and that, by holding that the absence of notice "offend[ed] the court's sense of justice and fair play," the Wisconsin court implicitly condemned the union's conduct as arbitrary. (Pltf.'s Reply, Docket Entry # 23, at 7.) Benson's reasoning is not convincing. The *Clark* decision clearly rests on a rationale that has been extinguished by the Supreme Court's subsequent decisions in this area that find the union does not breach its duty of fair representation where it takes a "good faith position contrary to that of

some individuals whom it represents *nor in* supporting the position of one group of employees against that of another." *Humphrey*, 375 U.S. 335, at 349, 84 S.Ct. 363, at 371. Since "[c]onflict between employees represented by the same union is a recurring fact" and gagging the union would weaken the collective bargaining and grievance process, the union "must be free to take a position" on significant disputes and should not be neutralized when the issue is between two sets of employees. *Id.* at 349–50, 84 S.Ct. at 371–72. "The collective bargaining system ... subordinates the interests of an individual employee to the collective interests of all employees in a bargaining unit." *Vaca*, 386 U.S. at 182, 87 S.Ct. at 912; *Dunlap v. United Transp. Union*, 826 F.Supp. 957, 960 (E.D.Va.1992), *aff'd sub nom. Lorello v. United Transp. Union*, 993 F.2d 1537 (4th Cir.1993).

The dissenting opinion in *Clark* points out an additional deficiency in the majority's holding. By requiring that notice be given to adversely affected employees in order for an arbitration decision to be binding upon them, the majority essentially imposed a new procedural requirement upon labor arbitrations. Justifying its new rule on what it deemed to be "in the best interests of sound public policy," the majority's reasoning was suitably criticized by the dissent as an exercise in legislation. *Clark*, 99 N.W.2d at 140 (Fairchild, J.) Accordingly, *Clark* is not persuasive, and Benson's advocacy of its reasoning should be rejected.

Benson also urges the Court to follow the reasoning in *Smith v. Hussmann Refrigerator Co.*, 619 F.2d 1229 (8th Cir.1980) (*en banc*), *cert. denied*, 449 U.S. 839, 101 S.Ct. 116, 66 L.Ed.2d 46 (1980), a more recent decision involving similar facts. Having generated four opinions by six Judges, however, *Smith* is not a persuasive precedent. The case involved a jury trial on the issue of whether a union had violated its duty of fair representation in pursuing grievances on behalf of one group of employees that adversely impacted another group of employees and in failing to give the adversely affected group the opportunity to participate in the grievance proceedings.

As Benson emphatically points out, the plurality opinion in *Smith* stated that "failure to invite the plaintiffs to the arbitration hearing may have left them inadequately represented regarding a crucial factor in the dispute." *Id.* at 1242. This was so because the arbitrator clearly viewed the employees' experience as determinative in his decision regarding relative skill and ability, and the court "inferred that plaintiffs would ... be able to relate their outside work experience better than the company representative." *Id.* This part of the opinion was not, however, joined by any of the other five judges on the panel. In fact, the three concurring judges found no breach of the union's duty in its handling of the arbitration hearing itself. They reasoned that the union's post-hearing agreement with the employer to return to the arbitrator for a reconsideration of the decision without notice to the plaintiff sufficiently evinced the union's lack of good faith to support the jury's verdict that the union had breached its duty of fair representation. *Id.* at 1246–47. The two Judge dissent attacked the majority's holding as precluding the union from representing senior employees against junior employees who have been selected by the company for their skill and ability, unless the union "first conducts an internal hearing or an intensive investigation to determine whether, in fact, the senior employees' skill and ability is substantially equal to that of the junior employee." *Smith*, 619 F.2d at 1250. *Smith* thus does not persuasively support Benson's position that the union breached its duty by failing to provide him notice of the proceedings. *But see Barnard v. Commercial Carriers, Inc.*, 863 F.2d 694, 699 (10th Cir.1988) ("All parties in an arbitration proceeding are entitled to notice and an opportunity to be heard," including adversely affected employees.) (citations omitted), and *id.* at 699, Seymour, C.J., concurring (the union breached its duty of fair representation by failing to notify the affected employee of the grievance proceeding or inviting him to attend, citing *Smith v. Hussmann*, 619 F.2d at 1241.)

In *Ramsey v. NLRB*, 327 F.2d 784 (7th Cir.) *cert. denied*, 377 U.S. 1003, 84 S.Ct. 1938, 12 L.Ed.2d 1052 (1964), the Seventh

Circuit declared that "[t]here is no statutory or constitutional right to be present at an arbitration hearing," rejecting the employee's contention that his rights were denied since he was not given notice of the arbitration hearing and did not appear there. The court specifically noted that the facts showed "that the company fully and adequately defended [the employee's] rights at the hearing." *Id.* at 788. In other words, the employee was not prejudiced by lack of notice of the arbitration because his employer fully presented the employee's case at the hearing, and the union thus had not breached its duty to the employee.

More recently, the Ninth Circuit has declared that "a Union does not breach its duty of fair representation by failing to give a grievant notice and an opportunity to attend a grievance hearing where the issue is the proper construction of a collective bargaining agreement." *Evangelista v. Inlandboatmen's Union of the Pacific,* 777 F.2d 1390, 1397 (1985) (citations omitted). Once again, the court specifically noted that the employee "was not prejudiced by her inability to attend the [grievance] meeting" because she admitted that all the information that she wanted considered had been provided and she could not have added relevant information. *Id.*

■ As the decisions discussed above demonstrate, there is no absolute requirement that a union inform its adversely affected members of its grievance activities. The cases indicate that a lack of notice may be indicative of a union's indifference to its employees' interests and thus constitute a breach of duty if the union's breach causes an error in the arbitration process. "If a union representative makes no effort to communicate with the persons directly affected by its action and takes action without investigation or adequate notice and opportunity to be heard, these acts and omissions may constitute a breach of duty of fair representation." *NLRB v. American Postal Workers Union,* 618 F.2d 1249, 1255 (8th Cir.1980). As noted even in *Smith,* "a union's failure to inform an employee whose interests are before an arbitrator of the arbitration hearing is not necessarily sufficient to support a claim of unfair representation," and the

courts have therefore "carefully searched the records for prejudice to the employee. When the position of the employee has been adequately presented, no breach has been found." 619 F.2d 1229, 1241; *see also Warehouse Union, Local 860 v. NLRB,* 652 F.2d 1022, 1025 (D.C.Cir.1981) (union's failure to inform its members of certain information was "clearly arbitrary conduct and a breach of duty" where this information was directly relevant to a decision that the members themselves had to make).

As Benson notes, most of the cases dealing with the union's breach of its duty of fair representation concern actions brought by the grievant, complaining about the union's refusal to pursue a grievance or deficiency in pursuing the grievance. In this case, by contrast, the union effectively pursued the grievance, but its pursuit happened to detrimentally impact another member without affording him an opportunity to defend himself. The National Labor Relations Board addressed a similar set of facts in *Washington–Baltimore Newspaper Guild,* 239 N.L.R.B. 1321, 1979 WL 8651 (N.L.R.B.) (1979). A senior employee, Washington, had been bypassed for a promotion in favor of a junior employee, Kelly, on the basis of the employer's determination that the junior employee was more qualified. The union pursued a grievance on behalf of Washington, alleging that the bargaining agreement required the promotion of the senior employee when both candidates were at least minimally qualified. The grievance was eventually submitted to arbitration without affording Kelly an opportunity to present his position. In his action against the union for breach of its duty to fairly represent him, Kelly argued that the union was required to give him an opportunity to show why he was more qualified for the position than Washington. The NLRB held that, since the controlling provision of the agreement had never been authoritatively interpreted, the union's first task in deciding whether to pursue Washington's grievance was to determine the proper interpretation of that provision. The Board held the interpretation advanced by the union was as reasonable as that advanced by the employer, and a choice of either theory would have placed the union on the side of one and against the

other applicant, so the union was entitled to pursue its interpretation and was not required to consult those who might be adversely affected. *Id.* at *2. The Board interpreted the agreement to require that promotions be based on seniority when the qualifications of the applicants were "relatively equal," thus making qualifications relevant, but the Board nevertheless dismissed Kelly's complaint that the union breached its duty by not consulting him concerning his qualifications. The Board specifically noted, however, that had there already been established an interpretation that relative qualifications were the primary consideration, however, then the union would, "of course, have been obliged to consider the relative qualifications of the two applicants." *Id.* at *3.

In the present case, CWA was at least as justified in not consulting Benson, since CWA was relying on the language in Arbitrator Able's previous arbitration decision concerning the interpretation of the precise clause at issue. Although Arbitrator Harlan did find that the earlier decision was not *res judicata* in the present case, CWA's reliance on the earlier decision was reasonable.

■ The Court thus concludes that, since CWA was acting in reliance upon an earlier interpretation of the meaning of "best qualified senior applicant" that had been rendered in an arbitration concerning the same parties to the collective bargaining agreement, CWA's pursuit of the Kirker grievance was reasonable, despite the union's indifference to Benson's position. The fact that the language in the earlier decision was merely *dicta* does not undermine the reasonableness of CWA's reliance upon that interpretation. In the words of CWA's representative Norman · Gleichman, there was "nothing that Benson could have said that would have made any difference" to CWA's interpretation of the "best qualified senior applicant" clause. CWA's position rendered Benson's allegedly superior qualifications irrelevant by requiring the selection of the senior applicant if she was qualified. CWA's indifference to

Benson's qualifications was not "so far outside a wide range of reasonableness" as to be irrational, and there has been no serious contention that CWA's actions were discriminatory or in bad faith, under the standard announced in *Vaca* and clarified in *O'Neill.* See also *Dunlap,* 826 F.Supp. 957, 960. The Court FINDS that, on these facts, CWA did not breach its duty to fairly represent Benson.

### B. Breach of Contract

■ As stated previously, to prevail in this hybrid fair representation/§ 301 action, Benson must not only demonstrate a breach of duty by the union, but must also show that his demotion was contrary to the contract. *Hines v. Anchor Motor Freight, Inc.,* 424 U.S. at 570–71, 96 S.Ct. at 1059–60. In order *to overturn an arbitration decision, an employee must establish that there is* "substantial reason to believe that a union breach of duty contributed to [an] erroneous outcome of the contractual proceedings." *Id.* at 568, 96 S.Ct. at 1058; *Ash v. United Parcel Service, Inc.,* 800 F.2d 409, 411 (4th Cir.1986). The "contractual proceedings" referred to are the arbitration proceedings specified in the Agreement.

■ In addition to finding that Benson has not shown that the union breached its duty, the Court concludes as an alternative basis for denying Benson's motion for summary judgment on the First and Third claims that Benson has failed to show an erroneous outcome in the arbitration proceedings, even if the Court had found that CWA had violated its duty.

The question is thus whether the absence of Benson's testimony from the proceedings,[4] testimony from this applicant whom Contel's management team found so convincing and so articulate, so undermined the integrity of the arbitration hearing as to render the arbitration decision erroneous. Benson argues that by precluding his participation, the arbitration process produced an erroneous decision because he could have offered testimony

---

4. The parties vehemently contest whether Benson would have been entitled to intervene in the arbitration hearing on his own behalf. The Court offers no opinion on this issue, but as-

sumes that Benson would have been permitted at least to testify on his own behalf at the arbitration hearing had he attempted to intervene.

**926**

that would have been highly material to the arbitrator's decision. He contends that the relative qualifications of Kirker and himself were the pivotal facts in issue at the arbitration hearing and that "Arbitrator Harlan was not presented with the key testimony from Benson concerning his (Benson's) experience with a previous employer that made him substantially more qualified for the position than Kirker." (Pltf.'s Mem. in Opp., Docket Entry # 21, at 2.) Had he testified, he could have explained how his "supervisory experience and his experience in construction ... with other employers" in fact did provide him with qualifications superior to Kirker's with respect to the requirements on the job posting. (Pltf.'s Mem. in Support of Pltf.'s Motion, at 30; *see* Declaration of James T. Benson, docket entry # 14.) Benson also believes that the arbitration decision indicates that

> Arbitrator Harlan did not consider Contel's presentation convincing. However, Arbitrator Harlan was not presented with a clear and detailed explanation of how my background and experience with my prior employer (RCA) made me more qualified than Barbara Kirker for the posted Service Technician position.

(Declaration of Benson at 4.) Benson's argument that he was prejudiced by not being called to participate in the arbitration process is not convincing, in light of Arbitrator Harlan's reasoning in the arbitration decision. Accepting Benson's argument that he could have presented his superior qualifications in a manner that would have been far more convincing than the manner in which Contel's management presented them, Benson still has failed to show that the arbitrator's decision was erroneous.

Benson's argument ignores Arbitrator Harlan's reasoning, which focused on Contel's decisionmaking process in selecting Benson. Harlan emphasized Contel's obligation to make its selection based on the qualifications stated in the "Notice of Job Opening" that Contel itself created. In relying on Benson's previous experience with another employer, Contel essentially created qualifications for the Service Technician position that were not listed in the Notice. Noting that management has the right to determine the method to be used in determining qualifications, Arbitrator Harlan held that "[i]t is fundamental that in determining who is selected, Management is limited in its inquiry to the qualifications stated on the job posting." (Harlan decision at p. 19.)

Harlan's decision shows that he was fully aware of the nature of Benson's superiority. He simply found that Contel was not entitled to rely on this aspect of Benson's superiority so as to bypass Kirker in favor of Benson. Harlan's analogy is particularly apt to illustrate his reasoning:

> [A]ssume an employer posted a job which required only a chauffeur's license but in interviewing applicants it found one applicant had a CDL (Commercial Driver's License) and awarded the job to that applicant on the basis he was "best qualified." Obviously it would be adding a requirement not stated on the posting. In our Case, Management admittedly gave considerable weight to Jim Benson's supervisory experience and his experience in construction even though neither was listed on the Posting as being either a primary or a secondary requirement.

(Harlan dec'n at p. 19.)

Arbitrator Harlan determined that the "best qualified senior applicant" language is ambiguous and open to interpretation, and he refused to clarify precisely the weight to be accorded to seniority and relative qualifications under the award. (Harlan dec'n at p. 23.) He did, however, hold Contel to its interpretation of the clause as meaning that "the senior qualified applicant gets the job if he/she is as *well qualified* or *nearly as qualified* as other applicants." Although relative qualifications thus became an issue at the arbitration hearing, Arbitrator Harlan's reasoning demonstrates that Benson's proffered testimony would have been superfluous. Harlan focused on the decisional process of Contel's management team that made the selections, and he determined that their testimony indicated that Benson's experience with other employers was a major factor in his being rated the highest. Benson's proffered testimony would have merely described his outside experience in greater detail.

Benson's proffered testimony would not have impacted Arbitrator Harlan's decision, based on his interpretation of the agreement, and, despite Benson's absence from the proceedings, there is no substantial reason to believe that any breach of duty by CWA contributed to an erroneous outcome in the proceedings. Accordingly, the Court FINDS that, on the First and Third Claims, Benson's motion for summary judgment should be DENIED, and CWA's motion for summary judgment should be GRANTED for this additional reason.

## II. The Constitutional Claims

 Benson's alternative theory for relief, stated in the Second Claim of the Complaint, alleges that if there was no breach of the duty of fair representation in CWA's failure to give Benson notice of and opportunity to participate in the Kirker arbitration, then § 9(a) of the NLRA is unconstitutional as applied. Specifically, Benson claims that CWA's use of its authority in taking action adversely affecting him without giving him notice and an opportunity to be heard abridges Benson's right to free association under the First Amendment and deprives him of due process of law under the Fifth Amendment, and § 9(a) is therefore unconstitutional as applied. (Complaint ¶ 16.)

CWA presents a twofold response, both in its own motion for summary judgment and in opposition to Benson's. First, CWA argues that the specific purpose of the *duty of fair* representation is to preserve the constitutionality of the federal labor statutes, and the individual interests of represented employees are properly protected by the requirement that the union refrain from acting in an arbitrary, discriminatory, or bad faith manner. Second, CWA contends that, even if the duty of fair representation does not adequately cover all potential constitutional concerns, the Constitution does not apply directly to restrict CWA's activities, because CWA is not a state actor.

Benson's constitutional arguments are meritless. Benson relies heavily upon *Steele v. Louisville and Nashville R.R.*, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944), where the Court first announced the union's duty of fair representation in the context of a union's discrimination against minority members of the bargaining unit on the basis of race. Although the Court alluded to constitutional concerns that would arise in the absence of any duty on the part of the union to consider the interests of the minority, the Court avoided addressing the constitutional issues by basing its decision on the terms of the federal statute. 323 U.S. at 198–99, 65 S.Ct. at 230. The Court reasoned that if the statute conferred exclusive bargaining authority on a union "without any commensurate statutory duty toward its members, constitutional questions [would] arise." *Id.* at 198, 65 S.Ct. at 230.

The Court averted these constitutional questions by finding that Congress, in granting the labor union the authority to act on behalf of a group of employees, did not intend to "confer plenary power upon the union to sacrifice, for the benefit of its members, rights of the minority of the craft, without imposing on it any duty to protect the minority." *Id.* at 199, 65 S.Ct. at 230. "The statute imposes upon the ... representative ... at least as exacting a duty to protect equally the interests of the members of the craft as the Constitution imposes upon a legislature to give equal protection to the interests of those for whom it legislates." *Id.* at 202, 65 S.Ct. at 232. The union's power to act as the class representative is accompanied by the "duty to exercise fairly the power conferred upon it in behalf of all those for whom it acts, without hostile discrimination against them." *Id.* at 202–203, 65 S.Ct. at 232. The constitutional issues raised by Benson are thus obviated by the duty of fair representation, which adequately protects any infringement on his constitutional rights that accompanies his being required to accept the union as his exclusive representative.

 CWA also contends that Benson's constitutional claims must fail for the additional reason that there is no government action involved in a union's pursuit of a grievance, and CWA's actions here are therefore not subject to constitutional restraints. Thus, the validity of Benson's First and Fifth Amendment claims depends upon the exis-

tence of state action. *See, e.g., Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 930, 102 S.Ct. 2744, 2750, 73 L.Ed.2d 482 (1982) (due process clause protects individuals from governmental and not private action); *Hudgens v. NLRB,* 424 U.S. 507, 513, 96 S.Ct. 1029, 1033, 47 L.Ed.2d 196 (1976) (First Amendment guarantee is only against abridgement by the government). To find state action, "the conduct allegedly causing the deprivation of a federal right [must] be fairly attributable to the state." *Lugar,* 457 U.S. at 937, 102 S.Ct. at 2753.

Once again, Benson relies heavily on *Steele* in support of his contention that CWA's acts as Benson's exclusive representative involve state action. As discussed above, however, *Steele* did *not* hold that the granting of authority by Congress upon the union to act as an exclusive representative converted the union into a state actor. On the contrary, in a torrid concurring opinion, Justice Murphy reprimanded the Court for "remaining mute and placid as to the obvious and oppressive deprivation of constitutional guarantees" shown by the union's racially discriminatory decisions, demanding "the invocation of constitutional condemnation." *Steele,* 323 U.S. at 234–35, 65 S.Ct. at 201–02. Justice Murphy's dissent thus demonstrates the fallacy in Benson's reliance on *Steele* for finding state action, and Benson's contention that "*Steele* is dispositive on the issue of governmental action" is thus not persuasive. (*See* Benson Mem. in Opp., docket entry # 21, at 26–27.)

The parties have additionally cited and disputed the significance of a number of decisions that address constitutional concerns and the state action question where a statutory grant of authority has empowered a private party to take action that it could not take in the absence of the grant of empowerment. *See, e.g., Kidwell v. Transportation Communications Intl Union,* 946 F.2d 283, 297 (4th Cir.1991) ("To raise the First Amendment argument, the union's actions must constitute state action. We are inclined to believe, however, that no state action exists outside of the narrow area of those actions taken by the union as the collective bargaining representative."), *cert. denied,* —— U.S. ——, 112 S.Ct. 1760, 118 L.Ed.2d 423 (1992). CWA's response is that CWA's actions in this context do not qualify as "state action" and thus are not subject to constitutional constraints.

In *Andrews v. Federal Home Loan Bank,* 998 F.2d 214 (4th Cir.1993), the Fourth Circuit explained the four contexts in which a private party can be deemed a state actor and thus subject to constitutional limitations. *Andrews* involved a federal bank employee's claim that he was fired in violation of his First Amendment rights. Although the case concerned a bank rather than a union and thus did not involve any issue under the NLRA, the court presents an enlightening discussion of the state action inquiry in finding that the Federal Home Loan Bank was not a government actor when it discharged one of its employees:

> In certain circumstances, a private actor can still be bound by constitutional limitations because its "conduct is fairly attributable to the state." *Arlosoroff v. National Collegiate Athletic Ass'n,* 746 F.2d 1019, 1021 (4th Cir.1984) (footnote omitted). In order to show state action by a private entity, however, it must be demonstrated that "the private party charged with the deprivation could be described in all fairness as a state actor." *Edmonson [v. Leesville Concrete Co.,* 500 U.S. 614, 620–22, 111 S.Ct. 2077, 2083, 114 L.Ed.2d 660 (1991) ] (citation omitted). A private party can be deemed a state actor in four contexts: (1) when the state has coerced the private actor to commit an act that would be unconstitutional if done by the state; (2) when the state has sought to evade a clear constitutional duty through delegation to a private actor; (3) when the state has delegated a traditionally and exclusively public function to a private actor; or (4) when the state has committed an unconstitutional act in the course of enforcing a right of a private citizen. If the conduct does not fall into one of these four categories, then the private conduct is not an action of the state.

998 F.2d at 217. Benson argues that the second category listed in *Andrews* applies, involving cases "in which the government has delegated responsibility to a private party for

conduct that would be unconstitutional if done by the government." *Id.* at 218 (Benson's Mem. in Opp. at 30–31.). Benson argues that NLRA § 9(a) delegates to CWA the power to divest employees such as Benson of property rights in employment, and therefore converts CWA into a governmental actor. Benson's argument completely misapplies this category of governmental action, as explained in *Andrews,* because this category applies only to situations in which government has some affirmative constitutional duty that it has delegated to a private entity. When the government has not delegated a duty affirmatively imposed upon it by the Constitution, there is no state action if the actions are taken by a private entity. *Id.* at 218. Benson cites this category of state action to support his incongruous argument that "were the government itself to act as Benson's exclusive representative, and prosecute the Kirker grievance through arbitration, it would have to provide Benson with notice and an opportunity to be heard." (Pltf.'s Mem. in Opp., Docket Entry # 21, at 31.) This argument merely restates the obvious proposition that *government* action is subject to constitutional limitations. Benson completely fails, however, to point out any constitutional *duty* of the federal government delegated to CWA and pursuant to which CWA prosecuted the Kirker grievance. CWA's conduct in pursuing the Kirker grievance does not fall into any of the other categories of state action discussed in *Andrews,* nor does Benson attempt to fit it into any of those categories.

Benson also argues that if CWA's failure to provide Benson with notice and hearing does not amount to arbitrary conduct in violation of the duty of fair representation, then § 9(a) of the NLRA is unconstitutional as applied because it violates the Due Process Clause of the Fifth Amendment. (Benson's Mem. in Opp., docket entry # 21, at 35.) Once again, Benson's position is undermined by his reliance on *Steele* and the question of state action. Aside from *Steele,* Benson offers only two decisions in support of this argument. The first, *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938), held only that the validity of the NLRA would be brought into question

in the absence of a requirement that the National Labor Relations Board give notice and hearing to a union that faced the loss of contractual rights as the result of an NLRB proceeding to which it was not a party. The Court held that the NLRA itself required notice and hearing in this situation, although Benson makes the illogical contention that the Court would not have ruled against the NLRB on nonconstitutional grounds "unless the Court believed that to construe the NLRA any other way would be constitutionally invalid." (Benson Mem. in Opp., docket entry # 21, at 36.) Benson's conclusion not only represents a huge leap in reasoning, it infers a constitutional basis for the decision that is not supported by the language of the opinion.

Similarly inapt is Benson's reliance on *Silver v. New York Stock Exchange,* 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), in which the Court held that the New York Stock Exchange exceeded its authority under the Securities Exchange Act in failing to give the plaintiff securities dealers notice and opportunity for hearing before denying them access to private wire connections. 373 U.S. at 365, 83 S.Ct. at 1261. The Court stressed the Congressional purpose of effecting a scheme of self-regulation designed to ensure fair dealing, and this purpose could not permit self-regulative activity carried out in a fundamentally unfair manner. *Id.* at 364, 83 S.Ct. at 1260. *Silver* explicitly based this holding on the scope of the delegation of authority from Congress to the Exchange to engage in a system of self-regulation, and the decision does not rely on a constitutional basis. The Court does, however, explain in a footnote that the basic nature of the notice and hearing rights required of the Exchange is similar to the requirement that "public agencies, labor unions, clubs, and other associations have, under various legal principles, all been required to afford notice, a hearing, and an opportunity to answer charges to one who is about to be denied a valuable right." *Id.* at 367, n. 17, 83 S.Ct. at 1262 n. 17. This vague generalization provides little support for Benson's attack on the constitutionality of § 9(a) under the circumstances of the present case.

Moreover, Benson has failed to cite any authority, nor is the Court aware of any, that has addressed a parallel scenario and held that the duty of fair representation applies, that the union's actions adequately satisfied the duty, and yet the union's actions nevertheless violated the constitutional rights of a member of its bargaining unit. Benson correctly argues "where exclusive representation is *not* subject to the statutory limitations of the [duty of fair representation], the courts must decide 'the constitutional questions.'" (*Id.*) It is, however, precisely because the union's actions are subject to such statutory limitations that the constitutional questions do not arise. Benson's constitutional arguments are therefore simply inapposite, attempting to force a constitutional analysis onto a situation that a long line of precedent prescribes a statutorily derived standard alleviating the constitutional concerns. If Benson is entitled to any relief under these circumstances, the source of that relief must be the requirements of CWA's duty of fair representation.

The heart of Benson's argument is that, under these circumstances, he is constitutionally entitled to represent himself, independently from his bargaining unit and contrary to the collective bargaining scheme established by Congress in enacting the federal labor laws. It is well settled, however, that the union's duty of fair representation, prohibiting it from acting arbitrarily, discriminatorily, or in bad faith toward any member, adequately protects the individual's interests. *Vaca*, 386 U.S. at 182, 87 S.Ct. at 912–13.

Accordingly, it is recommended that Benson's Motion for Summary Judgment as to the Second Claim be DENIED, and that CWA's Motion for Summary Judgment as to Benson's Second Claim be GRANTED.

### Recommendation

For the foregoing reasons, it is recommended that the defendant Communications Workers of America's motion for summary judgment be GRANTED as to all Claims and that plaintiff James Benson's motion for summary judgment be DENIED. Judgment should be entered in favor of the defendants.

### DIRECTIONS FOR MAILING AND REVIEW PROCEDURES

The Clerk shall mail copies of this Report and Recommendation to counsel of record. By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed.R.Civ.P. 72(b):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing recommendation within ten (10) days from the date of mailing of this report to the objecting party (*see* 28 U.S.C. § 636(b)(1)(C) and Federal Rule of Civil Procedure 72(b)), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(e) of said rules.

2. A district judge shall make a *de novo* determination of those portions of this report or specific recommendation to which objection is made.

The parties are further notified that failure to file timely objections to the recommendation set forth above will result in waiver of right to appeal from a judgement of this court based on such recommendation. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir.1985) (quoting *Carr v. Hutto*, 737 F.2d 433, 434 (4th Cir.1984), *cert. denied*, 474 U.S. 1019, 106 S.Ct. 567, 88 L.Ed.2d 552 (1985)); *United States v. Schronce*, 727 F.2d 91 (4th Cir.), *cert. denied*, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984).

June 24, 1994